GODFREY M. HYAMS

*v.*

OLD DOMINION COPPER MINING AND SMELTING COMPANY.

[Submitted November 4th, 1913. Decided November 25th, 1913.]

1. Evidence *held* to require a finding that money proposed to be distributed by a corporation as dividends was surplus arising from the corporation's business, and was subject to distribution as authorized by Corporation law (act April 21st, 1896, *P. L. p. 286 § 30*), as amended by act March 28th, 1904 (*P. L. p. 275*).

2. Where a corporation has sufficient money or property with which to pay a proposed dividend without in any manner or to any extent impinging on its moneyed capital, whether such dividend shall be declared and paid and the amount, time and terms, are matters solely for the determination of the directors acting within their discretion.

3. Where the declaration of a dividend by the directors of a corporation was a proper exercise of their discretion, it was not material that they in so doing were dominated by another corporation owning a majority of defendant's stock, and that the distribution was pursuant to an agreement between defendant stockholders and the stockholders of such dominating corporation, to which neither defendant corporation nor its directors were parties.

4. Where a corporation was organized to hold the stock of defendant and another corporation, and trust certificates were issued to stockholders in exchange for their shares, and an agreement entered into between the stockholders as a management of the corporations, &c., the fact that plaintiff, a minority stockholder, purchased one hundred shares in the trust which he transferred on the books of the trustees to his own name, and that other shares stood in the names of other persons for him, and that he appeared by counsel at a meeting of stockholders at which the doings of the officers of the company during the preceding years were approved and the report of directors ratified, did not estop him from objecting to the declaration of a specified dividend by defendant's directors on the ground that it was an illegal misappropriation of capital.

5. Where, on the filing of a stockholders' bill to restrain the declaration of a dividend, an order was made restraining the directors of the corporation from declaring the dividend *pendente lite*, and, while the injunction was in force, a quorum of defendant's directors passed a resolution directing the president and treasurer to pay a special dividend from the fund in question as soon as counsel advised that the same could be done or an injunction restraining the same removed, such resolution ·

constituted a direct contempt which precluded defendant from obtaining a decree dismissing the bill to which it would otherwise have been entitled until the resolution had been rescinded.

On final hearing on bill, answer, replication and proofs.

The facts presented in this case are substantially the same as those dealt with by Vice-Chancellor Stevenson in the case of *Pierce* v. *Old Dominion Copper Mining and Smelting Co., 67 N. J. Eq. (1 Robb.) 399.* The Old Dominion Copper Mining and Smelting Company, the defendant in this suit, was organized under the laws of this state on July 8th, 1895. Its original authorized capital stock was $3,750,000. This was afterwards increased to $5,000,000, of which shares of the aggregate par value of $4,050,000 were issued and outstanding at the time of the filing of the bill. The original issue of stock was made for the purpose of purchasing a mining property in Arizona, which the company now owns. The transaction was promoted by Albert S. Bigelow and Leonard Lewisohn, who, as was alleged, made a secret profit in the promotion scheme which made them liable to the company for either a large block of stock or a large amount of illegal profits and damages received by them in the course of the promotion transactions.

The control of the company appears at that time to have been in Bigelow and his friends.

In 1902, the control of the company became vested in the persons who controlled its affairs at the time of the filing of the bill herein; on October 7th, 1902, the defendant corporation instituted two suits in equity in the supreme court of the State of Massachusetts against the said Bigelow, the first for an accounting for one hundred thousand shares of the capital of the defendant company received by him as undisclosed promoter's profits on the sale of the said mining properties to the defendant, with an alternative prayer for damages by reason thereof, and the second to obtain a rescission of a sale made by Bigelow and Lewisohn of what was denominated as outside properties, together with a return to the defendant of thirty thousand shares of its capital stock issued therefor, with a like alternative prayer for damages suffered by the company thereby.

Similar suits were instituted against Lewisohn in the Federal jurisdiction. Demurrers to the Lewisohn suits were allowed and the allowance sustained on appeal and the bills dismissed. *148 Fed. Rep. 1020.*

. Such proceedings were afterwards had in the Bigelow suits that final decrees were entered therein against him as follows: In the first suit there was a decree against him for $480,000, with interest from September 18th, 1895, amounting at the date of the decree to $832,160, with costs; and in the second suit for $700,000, with interest from September 18th, 1895, aggregating $1,213,566.67, besides costs. These decrees were affirmed by the supreme court of Massachusetts, on appeal (*203 Mass. 159*), and a further appeal to the supreme court of the United States was dismissed upon the ground that no federal question was found in the case. *225 U. S. 111.* From time to time payments have been made on account of these decrees, which payments aggregated, on August 26th, 1913, $1,933,565.60. This fund is invested partly in securities and partly in the form of loans.

In October, 1903, a plan was formulated by the persons who had control of the defendant corporation, to purchase a mining property in Arizona known as the United Globe Mines, and to consolidate it with the defendant corporation as provided in exhibits A (page 379), B (page 379) and C (page 382). This plan was enjoined by this court on January 12th, 1904, in a suit known as the Elliott suit. Beyond the fact that there was such a plan and such a litigation I find nothing in the circumstances that throws any light upon the present controversy. '

This litigation arises out of circumstances which begin with an agreement dated December 30th, 1903, made between stockholders of the defendant corporation, stockholders of the United Globe Mines and F. S. Moseley & Company, of Boston, the assenting stockholders evidencing their assent by signing their names to the agreement. The agreement provided that the Old Dominion stockholders should cause a corporation to be organized under the laws of the State of Maine with a capital stock of three hundred and fifty. thousand shares of the par value of $25 each, making a capital stock of $8,750,000, and authorized F. S. Moseley & Company to exchange stock of the

assenting stockholders in the Old Dominion company for stock in the Maine company on the basis of share for share, provided that such exchange should not be made unless two-thirds in interest of all the outstanding stockholders of the Old Dominion company should assent thereto, and so exchange their stock; nor unless the whole stock of the United Globe Mines and $350,-000 in cash should also be acquired prior thereto or simultaneously therewith by the Maine company. The Globe stockholders authorized Moseley & Company to purchase for their account one hundred and thirty-eight thousand shares of the Maine company stock, and agreed to pay therefor by the delivery to Moseley & Company of the whole of the outstanding stock of the Globe company and the sum of $350,000 in cash. This agreement was assented to by all the stockholders of the United Globe Mines and by over two-thirds of the stockholders of the defendant corporation, the result being that the Maine corporation, whose creation is provided for in the agreement, is now the owner of all the shares of the United Globe corporation and of one hundred and fifty-five thousand two hundred and forty-five shares of the defendant corporation, leaving outstanding, and in the hands of private stockholders, six thousand seven hundred and fifty-five shares, of which the complainant owns three thousand and fifty-six shares, purchased by him in October, 1908, or over one-half of the shares which did not assent. The shares of the defendant, which belong to the Maine corporation, stand on the defendant's books in the names of Charles S. Smith and D. Blakeley Hoar, as trustees, and any dividends which might be declared by the defendant on the shares held by the said trustees would be payable to them. This trust is evidenced by certain agreements—exhibit G (page 398), exhibit H (page 403), exhibit I (page 407).

The trustees have issued certificates signed by themselves by which they certify that the holder thereof is entitled to shares in the trust known as the Old Dominion Trust, created by the agreements just mentioned, which trust certificates are transferable only in writing on the books of the trustees by the shareholder in person, or by his authorized attorney, and upon the surrender of the certificate

therefor. The complainant, Hyams, is the holder and owner of one of these certificates for one hundred shares in the Old Dominion Trust. It is dated November 2d, 1907.

The agreement of December 30th, 1903, provides in a general way for the division of the properties of the United Globe company, and the defendant, for the purposes of the agreement, into two classes by paragraphs 4, 5 and 6 thereof, and for the division *pro rata* among the stockholders of the respective companies of such of the assets as were intended to be segregated by that agreement, and the agreement provides that the Maine company shall make provision therefor by by-laws or agreements, or both, and that so far as relates to the Old Dominion interest, it shall provide that the net proceeds of such assets shall be taken to be the surplus from the proceeds of such assets remaining after deducting therefrom all debts and liquidated claims of the Old Dominion company incurred prior to January 1st, 1904, otherwise than for construction, and which exceed $25,000 in amount, and deducting also the amount required for the payment of counsel fees and incidental expenses of the Old Dominion interest.

The next step in the transaction was the organization of the Maine corporation on January 15th, 1904, and the adoption by it on that day of a by-law, whereby it agreed to cause the defendant to carry out the terms of the agreement of December 30th, 1903; and a few days later, on January 21st, 1904, the defendant adopted a resolution, a copy of which is found in the bill of complaint. (Record, page 6.) It is conceded that by that resolution the Bigelow money, together with the other items mentioned therein, were held as a separate fund, apart from other moneys and property of the corporation.

The defendant company now proposes to pay a dividend of $10 per share out of the assets which were segregated by the resolution of January 21st, 1904. The complainant, as a stockholder, will receive his proportionate share of the fund so to be divided. The fund includes the moneys received on account of the decrees against Bigelow.

On October 12th, 1912, the present bill was filed. It prays that the defendant and its officers and directors may be enjoined from declaring as a dividend the whole or any portion of the

money received by it from the Bigelow decrees, and from recognizing in any way or doing any act in furtherance of the agreements thereto annexed and designated as schedules D, G, H and I. These are the agreements to which specific reference has already been made. No attempt was made to declare such a dividend until June 3d, 1913. On that day the board of directors passed the following resolution:

"70. Voted that the president and treasurer be and they hereby are authorized to pay a special dividend from the special fund of ten dollars per share, as soon as counsel advises that the same can be paid, or the injunction restraining payment of same is removed."

The directors of the defendant corporation and of the Maine corporation at the time of the filing of the bill herein were each seven in number. Three of them—C. S. Smith, Altmiller and J. W. Smith—were directors of both corporations.

*Mr. Edward M. Colie,* for the complainant.

*Mr. Gilbert Collins* and *Mr. Edward F. McClennon* (of the Massachusetts bar), for the defendant.

HOWELL, V. C.

It is now proposed by the defendant and its directors to pay to its stockholders a dividend of $10 per share, giving to each his proper proportion thereof, from the funds which have been called the "segregated assets" of the company, and which consist very largely of the moneys recovered by the enforcement of the decrees against Bigelow. Such a dividend will require the sum of $1,620,000, some $300,000 less than the amount collected to this date upon the decrees. It is objected that the Bigelow money is capital and not surplus, and that to distribute it to the stockholders in the form of dividends would be a violation of section 30 of the Corporation law as amended in 1904. *P. L. 1904 p. 275.* Consequently, the first question to be decided is whether the Bigelow money belongs to and is part of the money capital of the corporation, or whether taking an account of all the assets and liabilities of the corporation there remains a surplus out

of which the proposed dividend may be lawfully declared. The statute (*P. L. 1901 p. 246*) now declares that unless otherwise provided in the incorporation papers or in by-laws adopted by at least a majority of the stockholders the directors shall, in January of each year, after reserving a working capital fixed by the stockholders, declare a dividend among the stockholders of the whole of its accumulated profits exceeding the amount so reserved and pay the same to such stockholders on demand, but that the directors shall not make dividends except from the company's surplus or from the net profits arising from its business. *P. L. 1904 p. 275.* Therefore, before reaching any conclusion on the question of the ability of the corporation to pay dividends lawfully, we must inquire into its assets and liabilities and ascertain whether, after payment and satisfaction of all liabilities, taking into account the liability to redeem the capital stock at par there still remains a fund out of which the proposed dividend can be paid without impairment of the capital, or whether there are net profits arising from the business which can be used for that purpose. *Goodnow* v. *American Writing Paper Co., 73 N. J. Eq. (8 Buch.) 692.*

It appears that on July 31st, 1913, the books of the company show total assets of $9,344,639.37, and liabilities of $4,808,-861.33 (including the capital stock liability), leaving a 'surplus of $4,535,778.04. Obviously, if these figures are correct, there is in the possession of the company sufficient surplus for the purpose of the dividend. It was argued that inasmuch as the decrees went against Bigelow because of the abstraction by him of moneys claimed to belong to the cash capital of the company, the recovery when made should have been credited to capital account for the purpose of restoring the capital which had been depleted by his act in the promotion scheme. But, on the other hand, it now appears when the Bigelow recovery is included that the company has sufficient assets over all its liabilities to make good its capital, which has been accumulated from its current net profits, and that consequently the Bigelow money is not needed for the purpose of meeting any impairment of the money capital. It, therefore, belongs to that portion of the company's funds which is denominated surplus. It was originally carried on the

books of the company in an account entitled "Old Dominion Special Account," and it was 'subsequently entered in the ledger under the name "Special Fund Account." Later on, and after the bringing of this suit, it was transferred to an account which was called "Reserve Account for the Payment of Dividends." But it makes no difference whether it is carried as surplus or as segregated assets or in a special fund account or otherwise.  It is money which belongs to the corporation and is under the control of its directors, and it is subject to distribution among the stockholders if the directors see fit to make distribution of it. *Bassett* v. *United States Cast Iron Pipe and Foundry Co., 74 N. J. Eq. (4 Buch.) 668; affirmed on appeal, 75 N. J. Eq. (5 Buch.) 539.*

The only items in the defendant's statement of assets and liabilities as of July 31st, 1913, which are subject to criticism, are the items relating to mines and mining claims, and new plant, and construction. Mines and mining claims belonging to the company are carried on the books at $3,414,856.81. This appears, from the testimony, to be a careful and conservative statement of the values of those items. As testified to by the president of the company their value is from four to five million dollars, exclusive of any of the plant improvements. The complainant, who is a mining engineer of large experience, and who was the man that was depended upon at the time of the original purchase to advise the officers and directors as to the development of the mine, and who has a perfect knowledge of the mines and mining claims, was asked whether, in his opinion, the president's valuation was high or low. His answer was that it was low. I think that I must assume from these statements that the real value of the mine and mining claims exceeds the sum at which they are carried on the company's books by a large amount.

The other item, which is called new plant and construction, and aggregates $3,013,754.37, was largely discussed by counsel on the argument. It represents moneys expended on the construction and erection of the operating plant and machinery, and so far as I can see, it represents actual expenditures and actual values. It cannot be said that the operating plant of a mine has little or no value simply because it is used as a factor in the de-

velopment and working of a wasting property. It, or its equivalent, is necessary to the operation of the mine, and its valuation for that purpose must be left to the honest judgment of the board of directors. No case of fraud in the valuation of this item is shown, and a mere mistake of judgment, if honestly arrived at, must stand as the final act of the directorate.

The total surplus of $4,535,778.04 is carried on the books of the company in four items:

| | |
|---|---:|
| Reserve against special fund | $1,956,483.08 |
| Plant renewals | 759,344.37 |
| Mine renewals | 867,073.91 |
| Profit and loss | 952,846.68 |
| Total | $4,535,778.04 |

If these figures are correct there can be no doubt but that the company, after providing for all its liabilities upon a full adjustment of all its affairs, including a proper charge for depreciation and renewals, has sufficient money or property with which to pay the proposed dividend without in any way or to any extent impinging upon the fund known as the company's money capital. Having reached this conclusion, it is hardly necessary to say that the question of the declaration of a dividend and its amount, time and terms of payment, are entirely within the honest discretion of the board of directors. *Murray* v. *Beattie Manufacturing Co., 79 N. J. Eq. (9 Buch.) 604; Blanchard* v. *Prudential Insurance Co., 80 N. J. Eq. (10 Buch.) 209.*

The next objections relate principally to the situation in which the directors of the defendant company find themselves. It is urged that in declaring the dividend in question the directors are acting under the compulsion of an agreement made between the defendant's stockholders and the stockholders of the United Globe Mines, and the agreements supplemental thereto, and that the presence of three common directors of itself is sufficient to render invalid any act in which the two companies may be interested. It will be remembered that the defendant corporation is not a party to any of the agreements complained of. Neither have its directors or officers in the remotest way become parties to it. The Maine corporation, by reason of its large holdings of

the stock of the defendant company, undoubtedly dictates the personnel of the defendant's directorate, and when it agreed that it would compel the performance of the agreements in question by the defendant, who was not a party to them, it did, so far as I can see, merely what it had a right to do as the predominant holder of the defendant company's stock. The point of these last-mentioned objections seems to have been considered by Vice-Chancellor Stevenson in his opinion in *Pierce* v. *Old Dominion Co., 67 N. J. Eq. (1 Robb.) 426;* and in view of the expression of the court of errors and appeals in that case (*74 N. J. Eq. (4 Buch.) 450*), it may well be argued that the reasoning of the vice-chancellor on the injunction motion was approved by the appellate court. This view appears to me not only to be reasonable, but, under the circumstances, the only view that could be taken of the situation. The argument of the complainant is that on account of the circumstances in which the directors of the defendant are, it is impossible that there should be any relations between the companies at all. The other view is that so long as the defendant's directors confine themselves to lawful acts, this court will not interfere in an honest exercise of their discretion. The fact that the Maine corporation holds nearly all the stock of the defendant corporation casts upon it the duty of seeing to it that the affairs of the defendant company are properly and fairly and honestly managed with respect to the rights of all the defendant shareholders. This appears to me to have been accomplished. The complainant who now objects to the declaration of a dividend is being treated in the same manner in which the other stockholders are being treated, and he must and will receive his *pro rata* share of the moneys to be divided, without discrimination or distinction.

Finally, it is argued on behalf of the defendant that the complainant is estopped from questioning the validity of the proposed action, for the reason that he ratified everything that had been done, with full knowledge of all the details thereof by the purchase of one hundred shares in the Old Dominion Trust which he had transferred on the books of the trustees to his own name, and besides other shares which stand in the names of other persons for him. I do not think that this is an acquiescence in

the scheme of sufficient force and cogency to operate as an estoppel. Neither do I think that his motives in making these purchases can be inquired into as the case now stands. *Hodge* v. *United Steel Corporation, 64 N. J. Eq. (19 Dick.) 111.* Neither do I think that his appearance at the meeting of April 6th, 1910, by his counsel, Mr. Tyler, can be so construed, or that the vote by the stockholders on that day, approving all the doings of the officers of the company during the preceding year, and accepting the report of the directors containing the report of the treasurer, can be held to be a ratification of all the company's acts. It is likewise urged that an estoppel grows out of the fact that the complainant holds four hundred shares of the defendant company's stock, two hundred of which were once owned by Mr. Smith, both of whom were concluded by the decision in the Pierce suit, or actively assented to all the matters concerning which the complainant now complains. It may be true that the predecessors in title of these four hundred shares of stock have acquiesced in the policy of which the complainant now complains, but his remaining shares are not subject to the same disability, and I think it quite clear that he may sue with respect to his rights in them.

There is an incidental matter mentioned lastly, but of the first importance. Upon the filing of the bill in this cause on October 10th, 1912, an order was made which is still in force by which the defendant and its directors were restrained from declaring as a dividend to the defendant's stockholders the whole or any part of the moneys received by reason of the decrees against Bigelow. While this injunction was in force, and on June 3d, 1913, a quorum of the directors of the defendant passed the resolution above recited. This action of the directors seems to me to be a violation of the terms of the injunction, and sufficient to charge the defendant with process of contempt. I shall not assume that the contumacy was either wanton or intended as a manifestation of contempt. It is a technical violation of the injunction, however, and the court will not entertain any motion for a final decree on behalf of the defendant until this resolution shall have been rescinded.