# UNITED LIGHT & POWER CO. v. GRAND RAPIDS TRUST CO.*

# GRAND RAPIDS TRUST CO. v. UNITED LIGHT & POWER CO.

Nos. 6763, 6764.

Circuit Court of Appeals, Sixth Circuit.

Feb. 10, 1936.

On Rehearing June 30, 1936.

Charles McPherson, of Grand Rapids, Mich., and Park Chamberlain, of Chicago, Ill. (Norris, McPherson, Harrington & Waer, of Grand Rapids, Mich., and T. K.

Humphrey and Park Chamberlain, both of Chicago, Ill., on the brief), for appellant United Light & Power Co.

S. E. Knappen and W. N. Snow, both of Grand Rapids, Mich., and J. A. Noonan, of Niagara Falls, N. Y. (Knappen, Uhl, Bryant & Snow, of Grand Rapids, Mich., on the brief), for appellee Grand Rapids Trust Co.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

HICKS, Circuit Judge. .

This suit is ancillary to one brought by the Guaranty Trust Company of New York, trustee, to foreclose a mortgage executed by Grand Rapids, Grand Haven & Muskegon Railway Company (hereinafter called the railway). The District Judge in the foreclosure proceeding found the railway unable to meet and discharge its obligations, and, finding it to the interest of creditors and stockholders to have a receiver appointed, designated appellee, Grand Rapids Trust Company as receiver for all property of the railway. The receiver, having been authorized by the court, brought this suit against United Light & Power Company as sole stockholder of the railway (except for a few qualifying shares outstanding in others) and as successor by purchase to the United Light & Railways Company (hereinafter called United), likewise virtually a sole stockholder from 1912 to 1925. The receiver sued to recover a total of $579,000 paid to appellant and its predecessor in stock dividends, a sum in excess of $200,000 expended by the railway in management and contracting and engineering fees, and considerable sums paid out as interest at usurious rates, all of which it claims were unlawfully exacted by appellant and United from the railway by reason of the control exercised over it through the ownership of stock. It also sued for interest on the whole amount claimed.

The District Judge allowed a recovery of dividends paid after December, 1922, at which time he ruled the railway to have become insolvent; of management fees from 1917 to 1925 in excess of $6,000 per annum which he deemed a reasonable compensation; of engineering and contracting fees in excess of 5 per cent. of the cost of five designated major engineering proj-, ects which he considered were the only ones demanding outside engineering service. The court allowed interest on the above items from the dates they were received.

It held the high interest rates charged by United on moneys furnished the railway to be in effect charges for the lending of credit, and denied recovery.

Briefly, appellant, Union Light & Power Company, complains of all items of recovery, allowed, totaling $322,077.89; of the holding that the two dividends ordered returned were in fact cash dividends and not merely bookkeeping entries; of the holding that the contracts by which the management and contracting and engineering fees were established, were voidable; and, of the holding that the statute of limitations had no application.

Cross-appellant, the receiver, contends principally: That dividends from 1912 to 1921, inclusive, were not paid out of surplus or profits but out of capital, and that such payments were in impairment of capital and hence unlawful; that the payments of dividends under such circumstances was an evidence of bad faith on the part of the stockholder (United) in receiving them; that the court erred in not holding that reserves should have been set up to offset depreciation in the property; that it erred in holding that the loans from United to the railway were sales of credit rather than customary loans at usurious rates; that it further erred in not declaring all management and contracting and engineering contracts void.

It is urged that the bill of complaint is insufficient, in that the receiver sued as the representative of creditors without alleging that any of the payments complained of were made after insolvency. It is perhaps enough to say that there was no motion to dismiss the bill for insufficiency as provided by Equity Rule 29, 28 U.S.C.A. following section 723; but, aside from this, we think its allegations carry a fair inference of insolvency. The bill averred "that at all times during said period the actual cost of the property and assets of the railway company was less than the amount of its liabilities, including capital stock, and the actual value of said properties and assets was less than the amount of its liabilities, including capital stock. * * *" If more specific allegations were necessary, we think that upon the facts in the record we are justified in considering the bill as so amended. Norton v. Larney, 266 U. S. 511, 516, 45 S.Ct. 145, 69 L.Ed. 413.

The testimony and documentary evidence are voluminous. However, on the issues presented, it does not seem necessary

to burden this opinion with an undue recitation of details.

The railway, an interurban electric line, combining light freight and passenger carriage and running from Grand Rapids to Muskegon, Mich., with a branch line to Grand Haven, was organized in 1899 under the Street Railway Act of Michigan, and was constructed by Westinghouse, Church, Kerr & Co., contractor, about the year 1900. The cost to the contractor was $1,276,388.82 and to the railway $1,553,103.97. The expense was financed partly by the payment of cash and partly by the issue of $1,250,000 in bonds to the contractor dated May 1, 1901, with interest at 5 per cent. semiannually and maturing in 25 years, secured by the above-mentioned mortgage. Another $250,000 in bonds, making $1,500,000 in all, was reserved to finance the construction of a bridge at Grand Haven and for other purposes. $100,000 of these bonds went for the purchase of the Grand Haven Street Railway System. It does not appear just when or for what purposes the balance issued, though the full amount of $1,500,000 appeared on the books of the railway. Capital stock to the amount of $1,200,000 was also issued, but it was not paid for and represented no value except that which might accrue from appreciation in the value of the property. $1,100,000 of this stock was held by Westinghouse, Church, Kerr & Co., who operated and controlled the road from 1902 to 1912. $100,000 of the stock was issued to the organizers in exchange for franchises, rights of way, etc.

In April, 1912, United purchased the entire issue of stock for $300,000 and held it until the organization of appellant, which then acquired the stock and title and possession of all the assets of the railway and assumed all the liabilities of United. Appellant continued to hold this stock until April, 1925, when it sold the entire issue of $1,200,000 par value, together with $6,000 par value of bonds and an unsecured note of the railway amounting to $417,700, to United Motors Products Company for $25,000 in cash.

Continuously from April, 1912, to April, 1925, United and appellant, by virtue of their ownership of the entire issue of common stock, exercised complete control over the railway. The foreclosure of the mortgage was precipitated by the failure of the railway to meet the interest payments on the bonds on January 1, 1926, and to pay interest and principal at maturity on July 1, 1926.

The railway had a checkered existence. During the eleven years of Westinghouse ownership and control, it earned enough to pay operating expenses and the interest on its bonds, but it paid no dividends. For the first few years it operated at a slight loss, but later it did better, and on December 31, 1911, its balance sheet showed a surplus of $43,119.47. During this period, W. K. Morley served as vice president and general manager at a salary of $5,000 per year. In 1911 the books showed additions and betterments of $44,419.58, but up to that year no amount had been set up for depreciation. In 1912 the number of passengers carried was 1,058,275 and the freight 36,009 tons. The total operating revenue in that year was $327,544. In 1912 United took over the ownership and control of the railway as sole stockholder. Of the directors elected May 3, 1912, the president, Mr. Schaddelee, and the vice president, Mr. Hulswit, were vice president and president, respectively, of United. Morley continued as a director and general manager until June, 1922, when Sidney L. Vaughan, who had been with the railway since 1906, took his place. Neither Morley nor Vaughan were officers of United.

For about three years the books showed no substantial change in the operation of the railway other than the institution in December, 1912, of the practice of paying annual dividends. From 1916 to 1920 the books reflected a decided increase in business activity caused by the World War and the general prosperous condition of the country. The number of passengers carried reached its highest mark of 1,367,467 in 1920. Freight tonnage was highest in 1916, with 51,641. It lagged through the next two years, but jumped to 45,298 in 1919. It dropped to 33,625 tons in 1921 (a depression year), but rose to 42,221 in 1923. Thereafter with some fluctuations it declined to a low of 26,127 in 1927. Passenger traffic broke sharply between 1920 and 1921, dropping off nearly 400,000. Unlike the freight tonnage, it did not reflect the prosperous year of 1923, but declined steadily after 1920 to a low of 248,206 in 1927.

A number of factors complicated the affairs of the company, but we think it was made clear that the drop in traffic and earnings was due, not to poor management or poor condition of the road and equipment, for it was well maintained up to the sale

to the United Motors Products Company in 1925, but to the widespread operations shortly after the war of private passenger cars, freight and passenger bus lines, running on publicly financed hard-surfaced highways. These agencies provided a popular and adaptable competition which the railway as well as interurban railways generally could not meet.

The railway had no easy sledding during United's ownership. On June 12, 1914, Hulswit directed a letter to Morley pointing out that it was next to impossible to secure money by the sale of securities and practically ordered him to reduce his working force to the lowest possible minimum and to solicit no business entailing capital outlays for new side tracks, etc.

The widespread business activity caused by the war alleviated conditions somewhat, although money was always hard to get, but it raised a new hazard in increasing wages and operating expenses. On January 18, 1918, Hulswit sent another urgent letter to Morley calling attention to conditions, and stating that, unless material rate increases were allowed, it might be necessary to close down the plants. The road obtained another breathing spell through the passage of the Glaspie Act in 1921 (Pub. Acts Mich. 1921, No. 115) by the Michigan state Legislature granting the Public Utilities Commission the authority to increase passenger rates to a maximum of 3 cents a mile. The same act authorized the commission to make a survey to determine the reasonable requirements of such railroads to meet operating costs, taxes, property retiral, and return upon fair value. This authorization resulted in the appraisal and audit of the railway by Froehlich & Emery Engineering Company of Toledo and Detroit, whose report in several volumes submitted to the Michigan Public Utilities Commission on October 31, 1923, was put in evidence.

This report indicated that on October 1, 1921, the cost of the railway up to that date was but $1,944,143, though its replacement value was set at a higher figure. In 1918, in a rate case (Grand Rapids, Grand Haven & Muskegon Ry. Co. v. Groesbeck, Atty. Gen.) without allowing for going value, working capital, or materials and supplies, the court found the value of the property for rate-making purposes to be $1,800,-000. On December 31, 1921, the railway owed in current liabilities, including notes payable, $328,879.20. A year later this amount had increased to $354,393.23. In 1912 it had amounted to but $147,575.65.

■■ Giving due regard to the findings of the court, we find no reason to disagree with its conclusion that the railway was insolvent in December, 1922. Its assets were then substantially less than its bonds, notes, and current indebtedness. However skillfully and economically it might have been operated, its hope of success had faded with its loss of patronage. It could not reasonably expect to meet its obligations out of earnings. It might have anticipated some such denouement as that of April, 1925. There was no error therefore in adjudging that the dividends of $72,000 on December 22, 1922, and of $30,000 on December 10, 1923, were unlawful. Upon those dates these dividends represented a trust fund for the benefit of creditors.

■ Appellant urges that these dividends were never really paid, but were included in a note for $417,700 executed by the railway to United on November 1, 1924, which remains unpaid. We cannot accede to this view. The United Companies, both appellant and its predecessor, handled the railway's financial affairs. They collected and disbursed the interest on its bonds and borrowed money which they reloaned to the railway and for which they took the railway's notes in return. They ofttimes loaned money to the railway with which to pay dividends. This usage enabled them to show the receipt of regular dividends on their books, the better to maintain their own credit, which, judging from correspondence, was in a more or less strained condition. As it was able, the railway would pay off these notes, but "dividend" notes and others accumulated faster than they were paid, until finally, on November 1, 1924, appellant canceled them all and the railway substituted a single note for $417,700. The District Court held, and we think rightly, that these transactions embodied and were intended to embody actual obligations of the railway. Appellant collected interest on the notes. The total dividends were $579,000, and the high total of promissory indebtedness never exceeded $417,700. A large portion of the dividends was paid in cash, and we think it was expected the remainder would be. Moreover, appellant sold the note for $417,700 in 1925 to the United Motors Products Company, the present holder, to which the railway has since made payments both of interest and principal.

336

■ Cross-appellant urges that the railway was insolvent from its organization, that its assets, the railway property, never at any time exceeded its debts and the par value of its capital stock, and that therefore all the dividends were unlawfully declared. But, as indicated above, the stock issue of $1,-200,000 was not paid 'for. It in no sense represented actual capital. We do not understand that under such circumstances the railway was required to maintain assets at a level with its debts and the par value of its outstanding stock. The law was complied with if the assets equaled its debts and the amount for which it was actually liable to its stockholder, that is, the· amount received from the stockholder, and any surplus was available in the sound judgment of the directors of the railway for dividends. People of Colorado ex rel. Fraser v. Great Western Sugar Co., 29 F. (2d) 810, 813 (C.C.A.8); Hyams v. Old Dominion Copper Min. & Smelting Co., 82 N.J.Eq. 507, 89 A. 37; Goodnow v. American Writ. Paper Co., 73 N.J.Eq. 692, 695, 69 A. 1014; Excelsior W. & M. Co. v. Pierce, 90 Cal. 131, 140, 27 P. 44; Peters v. U. S. Mortgage Co., 13 Del.Ch. 11, 114 A. 598, 603; Tapscott v. Mexican Colorado River Land Co., 153 Cal. 664, 96 P. 271, 272. See, also, McDonald, Receiver, v. Williams, 174 U.S. 397, 407, 19 S.Ct. 743, 43 L. Ed. 1022.

We have been cited to no case and can find none where the failure of a corporation to keep assets in reserve sufficient to offset the par value of its stock is an impairment of capital to the extent of insolvency where the stock itself has not been paid for. Reduced to its simplest terms, this would mean that a corporation could impair actual working capital which never existed. This is paradoxical. We apprehend that ·in cases seeming to hold to the contrary the courts have assumed "par value stock" to mean fully paid up stock. Situations frequently arise where the receiver of an insolvent corporation may require delinquent stockholders to satisfy their unpaid subscriptions for the benefit of creditors, but we have no such case.

To sustain appellant's contention would permit the receiver, representing bondholders, to accomplish indirectly that which it could not accomplish by plenary suit against the stockholder because the original bondholder and stockholder, Westinghouse, Church, Kerr & Co., was identical and it of course knew that the bonds were not issued upon the faith of fully paid-up stock, and that it could not rely thereon for the payment of its debts. See Coit v. Gold Amalgamating Co., 119 U.S. 343, 347, 7 S. Ct. 231, 30 L.Ed. 420; Rickerson Roller-Mill Co. v. Farrell Fdry. & Mach. Co., 75 F. 554, 559 (C.C.A.6). The receiver does not contend that the present bondholders were advised otherwise.

■ Appellee through its accounting experts strenuously strove to show that the railway paid dividends out of funds that should have properly gone into reserve for depreciation. In this endeavor it offered voluminous testimony designed to show the cost of the railway and a hypothetical life in years for the various items of property and equipment upon which it calculated a yearly depreciation adjustment which would care for them as worn out. These involved calculations showed in 1923 an accumulated deficit of $167,961.53 exclusive of the dividends which had been paid by that time.

We do not feel required to determine whether such reserves were required for the protection of bondholders, for we are not impressed that the property ·and equipment were irretrievably depreciated in 1922. The Froehlich report was based on exhaustive examination of all the property of the railway, and its estimates indicated that even then it was in 77 per cent. condition. We are not disposed to say that the property was in first-class condition; it was far from it, but we do not feel that it had depreciated so hopelessly that it could not have been pulled up out of operating income had traffic been maintained. We are in accord with the report of the Interstate Commerce Commission of November 2, 1926, No. 15100, "Depreciation Charges of Steam Railroad Companies," that it would have been better practice to maintain depreciation reserves. However, the report recognized that it had been customary with many railroads to maintain operating conditions by charging replacements and repairs to operating expenses, and we think that the bulky evidence of repairs and replacements shows the railway had pursued that course to a marked degree.

■ As to management fees and contracting and engineering fees: In 1912 the railway paid United a management fee of $1,200 and for the next four years a fee of $6,000 per annum. In 1917 and 1918 the fee was slightly in excess of $9,000 per year, being·paid on the basis of 2 per cent.

on gross earnings. In 1919 a contract for an indefinite period was entered into between the railway and United for the payment of a management fee at the rate of 3½ per cent. on gross earnings. The fees paid on this basis hovered around $20,000 for five years, reaching a "high" of $23,-241.64 in 1920. In 1922 they amounted to $20,761.74, in 1923 to $19,108.53, in 1924 to $16,240 and in 1925 to $3,546.84. The last fees were paid at the same rate of 3½ per cent. but under a contract executed in January, 1924. A total of the management fees paid amounted to $169,327.71. United's duties under the contracts were somewhat indefinite, involving supervision and examination of the railway's properties, supervision of accounts, insurance, and the making and filing of official reports. United was to act as chief engineer, was to furnish special services, including the negotiation and sale of securities, to act as purchasing agent for the railway, and to employ a resident manager.

Contracting and engineering fees between 1914 and 1925 amounted to $33,004.-20. In 1914, 1915, and 1916 these were paid without express contract. In 1917 an engineering contract was made with United Light & Power Engineering & Construction Company, a subsidiary of United, in which the engineer agreed to design and lay out all work in connection with extensive improvements and betterments. It agreed to make drawings, specifications, and to secure bids, specifying in great detail the percentage of cost that would be charged by way of fees on each job of work done. In 1921 separate contracting and engineering contracts were made, dividing the work into actual construction and engineering preparation and supervision. These also set forth in detail the percentage to be·charged for each type of work. They were renewed with some changes in the charges in 1924.

The District Court found that the fees were excessive, that the railway had been efficiently managed prior to 1912 without any such service charges, and fixed a reasonable value of $6,000 per year for management services, ordering a return of the excess. It ordered the return of contracting and engineering fees on all projects except five major ones on which it allowed fees of 5 per cent.

We think it is going too far to say that such contracts made by a corporation with its sole stockholder are void [see Richard-

son's Ex'r v. Green (Washburn v. Green), 133 U.S. 30, 10 S.Ct. 280, 33 L.Ed. 516; Pittsburgh & W. V. Ry. Co. v. U. S., 41 F.(2d) 806, 811 (D.C.Ohio)], but, because they involve the relationship between the railway and its sole stockholder, they will be carefully scrutinized to see that they do not divert the assets of the railway to the stockholder without consideration.

The railway at all times had the usual complement of officers and officials. It had a general manager, traffic manager, general accountant, trainmaster, roadmaster, and foreman of bridges and buildings. Its management and operation presented no unusual problems. The fees received by United in the light of management costs prior to 1912 strike us at once as inordinately high. Still, some services were rendered. Denman, general manager of United, and Smith, one of its engineers, testified to dozens of trips of inspection and supervision made from Davenport, Iowa, or from Chicago. Several major jobs of rehabilitation and replacement, unnecessary in the first ten years, were put through. Hundreds of letters, discussing every phase of management, passed between Morley and United officers. Intricate and extensive blueprints were prepared; savings were effected in insurance and in purchases of equipment and supplies. All this was worth something, and there is no substantial reason for disagreeing with the findings of the District Judge.

A six-year statute of limitations of Michigan (Comp.Laws Mich.1915, § 12323) was pleaded and, if applicable, would bar a recovery of substantial portions of the management, engineering, and contracting fees because these fees were received before December 18, 1920, and the bill was not filed until December 18, 1926; but, as indicated above, the suit was essentially in equity for the recovery of a trust fund for the benefit of creditors. Lawrence v. Greenup, 97 F. 906, 909 (C.C.A.6); Detroit Trust Co. v. Goodrich, 175 Mich. 168, 175, 141 N.W. 882, Ann.Cas.1915A, 821. A court of law did not have concurrent jurisdiction. Under such circumstances, an equity court is not bound by a state statute of limitations [Kelley v. Boettcher, 85 F. 55, 62 (C.C.A. 8)], and we find no reason for applying the analogous equitable principle of laches.

There remains the question of the recovery of excess interest. The facts show that from slightly before the begin-

ning of the World War utilities had experienced difficulty in obtaining loans, but the railway was not forced into the money market for loans necessary to carry on its business. United did this for it, charging the high rates of 8 per cent. and 9 per cent. about which complaint is made. The legal interest rate in Michigan was 5 per cent., but the courts have noted a distinction between ordinary loans and those involving a lending of credit. See Philadelphia Warehouse Co. v. Seeman, 7 F.(2d) 999 (C.C.A. 2). In that case merchandise was deposited with the lender as security, who thereupon issued a note to the pledgor. He turned it into cash by sale to brokers. The pledgor paid charges totaling over 6 per cent., the legal rate. The court held that the transaction was a sale of credit and not tainted with usury. United had no money of its own to loan. It went out and borrowed upon its own notes. It then reloaned to the railway, charging the rates objected to. We agree with the District Judge that thus reloaning to the railway was the loaning of credit not affected by usury. National Bank of Newport v. Rand, 10 F.(2d) 688 (C.C.A.2); In re Samuel Wilde's Sons, 133 F. 562 (D.C.); In re Holmes Lbr. Co., 189 F. 178 (D.C.).

The decree included interest on each item received by the stockholders from the date it was received. The total was $103,476.09. This allowance was assigned as error by appellant. The allowance of interest in equity is in the sound discretion of the court. Miller v. Robertson, 266 U.S. 243, 258, 45 S.Ct. 73, 69 L.Ed. 265; National Home For Disabled Volunteer Soldiers v. Parrish, 194 F. 940, 943 (C.C.A.6); Penna. Steel Co. v. New York City Ry. Co., 198 F. 778, 780 (C.C.A.2); Kishi v. Humble Oil & Ref. Co., 10 F.(2d) 356, 357 (C.C.A.5); Sebastian Bridge District v. Hedrick, 4 F.(2d) 346, 349 (C.C.A.8). We find no abuse of discretion in the allowance of interest, but upon the other hand we think it was proper.

For a number of years it was the practice of the railway to deposit monthly with United and appellant the proportion of bond interest which would accrue on the succeeding January 1st or July 1st. On those dates the full amount so deposited would be returned to the railway to enable it to pay the bond interest. Cross-appellant insists that interest should have been allowed on these advances. The amount claimed was $7,342.26. This claim was not made in the bill, and no agreement to pay such interest was shown in the proof. The court disallowed it in its discretion, and no substantial reason appears for disturbing the ruling in this respect.

The decree of the District Court is in all things affirmed.

### On Petition for Rehearing.

MOORMAN, Circuit Judge.

Consideration of the petition for rehearing convinces the court that it was error to affirm so much of the decree below as allowed a recovery of management, contracting, and engineering fees paid to the appellant and its predecessor prior to December, 1922, the earliest date, as found by the court, of the insolvency of the railway company. The recovery is sought on behalf of the creditors of the railway company. There was no showing that the payments prior to the insolvency of the company were made with the intent to hinder, delay, or defraud the company's creditors. The reasons that impelled us to limit the recovery of dividends to such payments as were made after the date of insolvency require a like limitation in the recovery of contracting, management, and engineering fees. The affirmance is accordingly set aside, and the decree is modified by eliminating therefrom such parts of the awards therein as represent payments of contracting, management, and engineering fees made prior to December of 1922, and as so modified it is affirmed.

HICKS, Circuit Judge (dissenting).

I cannot concur. There is no hard and fast definition of the word "fraud." Its existence depends altogether upon circumstances. It should be considered here in its relation to the dealings between the railway and its sole and dominant stockholder. The stockholder by virtue of its control appropriated the fees involved. The District Court held that "these charges were excessive and clearly unjustified." 7 F.Supp. 511, 525. This finding had our approval in the original opinion. The stockholder profited by these payments at the expense of the railway and without any corresponding benefits to it. I think that equity requires that they should be restored to the assets of the railway from which they were taken, to be finally distributed for the benefit of bondholders, who were the principal creditors. See

Central Trust Co. v. Bridges, 57 F. 753, 766 (C.C.A.6).

I do not think the incidental date of insolvency affects the question.