254 F.2d 373
 J. K. DORSETT, Jr., As Executor Under the Will of J. K. Dorsett, Appellant and Cross-Appellee,
v.
W. T. SHORE, J. H. McAden, S. Y. McAden, Mrs. S. J. Cothran, Estate of Sallie J. McAden, and Miss Susan Bynum, respective shareholders in Merchants and Farmers National Bank, objectors and exceptors, in behalf of themselves and all other shareholders in said Bank, Appellees and Cross-Appellants.
 No. 7355.
 United States Court of Appeals Fourth Circuit.
 Argued January 24, 1957.
 Decided March 11, 1957.
 
 John S. Cansler, Charlotte, N. C., for appellant and cross-appellee.
 P. C. Whitlock, Peter H. Gerns, and John A. McRae, Charlotte, N. C., for appellees and cross-appellants.
 Before SOBELOFF, Circuit Judge, and HARRY E. WATKINS and GILLIAM, District Judges.
 SOBELOFF, Circuit Judge.
 The compensation allowed the liquidating agent of a national bank is in issue here. By presidential order, on March 4, 1933, the Merchants and Farmers National Bank of Charlotte, North Carolina, like all other banking institutions, closed its doors. This bank was not permitted to be reopened, but was placed in the hands of a conservator, J. A. Stokes, who was succeeded in June, 1934, by J. K. Dorsett, named as receiver by the Comptroller of the Currency.
 
 
 1
 Title 12, Section 197, U.S.C.A., provides that when receivership expenses and creditors' claims have been fully paid by the Comptroller of the Currency, a meeting of the shareholders shall be called to determine whether the receiver shall be continued and shall wind up the bank's affairs, or whether an agent shall be elected for that purpose. In this case, such a meeting was called and was attended, on November 9, 1937, in person or by proxy, by the owners of eighteen hundred and seventy-one of the two thousand oustanding shares, or ninety-five percent of the entire stock. They voted unanimously to terminate the receivership and elected J. K. Dorsett their agent. All of the stockholders now excepting to the fees allowed the agent were present or represented at the meeting. The meeting also appointed an Advisory Committee of shareholders, consisting of Harvey W. Moore, B. M. Edwards, and J. A. Stokes, with power to fix the agent's compensation, and to assist him in the sale of assets and otherwise.
 
 
 2
 The Committee fixed the agent's compensation at $200 per month, the same as he had been paid while receiver, but it was understood that additional compensation would be paid him contingent upon the results achieved. In his three years' and five months' service as receiver, Dorsett had collected not only enough to pay off the bank's debts and the receivership expenses, which included some $10,000 compensation to him, but he still had on hand and transferred to himself as agent cash and other assets of a face value of approximately $641,000.
 
 
 3
 In less than two years after his appointment as agent, he realized from the liquidation enough to repay the stockholders' statutory double liability assessment which had been levied against them, which assessment, together with interest, amounted to approximately $99,000. He also paid the stockholders a liquidating dividend of thirty-five percent on their two thousand shares of the par value of $100 per share.
 
 
 4
 One member of the Advisory Committee, Stokes, having died and no successor having been named, the surviving committeemen, Messrs. Moore and Edwards, wrote Mr. Dorsett a letter on December 29, 1939, expressing satisfaction with his work as liquidator and agreeing to supplemental compensation according to the following scale: If payments amounting to fifty percent, counting from December 1, 1937, should be paid the stockholders, Dorsett was to receive two percent on his total collections; if seventy percent, three percent; if eighty percent, five percent; if ninety percent, six percent; and if he should pay stockholders one hundred percent, he would receive nine percent of such total collections. At that time, two percent had been earned, and its payment was approved. It will be noted that future operations were to result in a higher percentage of compensation upon a base that included past as well as future dividend payments to stockholders.
 
 
 5
 On November 21, 1941, a further modification was made in the compensation agreement. It took the form of a letter to Dorsett signed by Edwards and Moore. Recited therein were his accomplishments: payment in full, with interest, of the sums due depositors (which payments had been made during the receivership); repayment of the stock assessment and interest thereon (which had been cited as a reason for the compensation award in the 1939 letter), and a "ninety percent payment to stockholders, with assurance of more yet to come." In short, in the two-year period, 1939 to 1941, fifty-five dollars per share had been distributed to stockholders, in addition to the thirty-five dollars distributed in the 1937-1939 period. The letter then promised the agent, in addition to his two-hundred-dollar monthly salary, that if stockholders should realize 103.5% (of par), he would receive 17% on his total collections as liquidating agent, that is to say, the higher percentage would apply to past as well as to future collections.
 
 
 6
 When Edwards signed this letter, he was in active negotiation for the sale of his stock to Dorsett, and the sale was consummated within three weeks. Upon selling his stock, Edwards retired from the Committee, and Moore alone thereafter acted as Advisory Committeeman.
 
 
 7
 From time to time, while serving as liquidating agent, Dorsett purchased other shares in the bank for himself and for members of his family. These purchases aggregated, according to the objecting shareholders, 812 shares — the Dorsett estate admits 762 — of the total 2,000 outstanding, from which a profit of over $11,000 was realized.
 
 
 8
 The liquidation continued for over thirteen years, and the total distribution to stockholders amounted to $123.40 per share. While par was only $100, the stock's book value was $425 and its market value $445 when the bank closed.
 
 
 9
 The agent's work was undoubtedly arduous, but it left him time for other activities. For a while he was receiver of another Charlotte bank, and for these services was paid $200 per month. He continued to draw $200 per month as liquidating agent of the Merchants and Farmers during the entire 13-year period, and this amounted, in all, to $31,600.
 
 
 10
 Bookkeeping and general secretarial work and fees for attorneys assisting in the liquidation were paid out of the bank's funds. Total collections amounted to $481,011.16, but this included $54,000 paid him as liquidating agent by the McAden Trust, of which Mr. Dorsett was one of the trustees, and he had received one-third of the two percent compensation paid the trustees for collecting this sum. Altogether, over $100,000 of the total collected by Dorsett as liquidating agent was paid over to him by the collecting agent of the McAden Trust and related sources. In collecting these funds, it is said, Dorsett had little to do other than to accept the checks.
 
 
 11
 In his conduct of the liquidation, Dorsett regularly submitted to the District Court for approval all sales of assets, compositions with creditors, and reductions in his bond. The question of the agent's compensation was never submitted to the stockholders, who appear not to have met after their meeting on November 9, 1937, when they voted authority to the Advisory Committee to fix the agent's compensation. The only time the question of compensation was presented by the agent to the District Court was in his final account, filed in 1952, as provided in the statute, when he sought an order approving and settling his account and discharging his sureties. In this account, the agent allowed himself, in addition to the monthly salaries, which amounted to $31,600, commissions at the rate of seventeen percent on his total collections or $80,367.49.[1] This aggregated a grand total of $111,967.49 for his services as agent.
 
 
 12
 Stockholders filed exceptions, asserting that the compensation retained was excessive. They further contended that although the amount claimed by the agent was in accordance with his arrangements made from time to time with the Advisory Committee, or two members thereof, the Court was not bound thereby, but, in the discharge of the duty to "settle and adjust" the agent's accounts, should make an independent determination.
 
 
 13
 On behalf of the estate of the liquidating agent, who died during the litigation, it is contended that as he was the stockholders' agent (citing Dobler v. Bawden, 238 Iowa 76, 25 N.W.2d 866, Iowa) and as the retained compensation was in accordance with his agreement with the Committee which the stockholders had empowered to fix his remuneration the District Court is without jurisdiction to review. According to this view, the statutory power granted the Court by Title 12, Sec. 197, U.S.C.A. to "settle and adjust such accounts and discharge said agent and the sureties upon said bond" is merely to see that the agreement with the Committee is carried out. With this interpretation we do not agree. The role of the Judge is not mechanical or ministerial, permitting him merely to check the arithmetic of the account. The very generality of the language — "settle and adjust" — indicates a design to give the Court broader scope. The Judge cannot properly perform his duty, which is judicial in character, without considering the reasonableness of the agent's compensation. It would be a strange statute which required judicial approval of every settlement or composition with debtors, large or small, but left the liquidator's fees subject to no judicial supervision. Such a constricted construction would condemn the statute to inadequacy and would defeat its evident purpose.
 
 
 14
 In the receivership of a national bank, it is the Comptroller of the Currency who fixes the receiver's compensation and oversees the receiver's activities. When the administration of the affairs of the bank is, by compliance with Section 197, transferred to a liquidating agent from a receiver, general supervision goes to the District Court instead of the Comptroller; otherwise, the stockholders' interest would have no adequate protection and the Judge's task of settling and adjusting accounts would become an empty form of doubtful utility. An undesirable settlement of a small claim might be prevented by the Court, but not the syphoning off of a substantial part of the estate by excessive fees to the liquidator, or by overcharges for expenses or otherwise.
 
 
 15
 It is true that Section 197 does not in terms authorize the Judge to review the liquidator's compensation. It is to be noted that the stockholders, also are not given specific authority to fix the agent's compensation. There is no reason to think that the power to fix compensation attaches to the power to select the agent, rather than to the District Court's power to settle and adjust accounts. Even if it should be thought that authority to fix the agent's compensation is embraced in the stockholders' authorization to the committee to make the selection, this would still be qualified by the Court's authority to settle and adjust his accounts, which authority springs from the statute. We do not think that the absence of a specific grant of authority to the Judge is significant, in light of the scheme of administration reflected in the statute. It is noteworthy that the related provisions, Sections 191-196, of Title 12, under which the Comptroller appoints receivers and fixes their compensation, are not more specific than is Section 197 in respect to the agent's compensation.
 
 
 16
 In the view we take of the law, it becomes unnecessary to consider whether the concurrence of fewer than all three committeemen was a valid action of the committee and whether the impending purchase of Edwards' stock influenced him to sign the 1941 letter.
 
 
 17
 As the District Judge said, there is "no particular yardstick" to determine the allowance of fees. We agree that, taking into account all the circumstances, the allowance claimed — $111,967.49 out of $472,749.91 — is disproportionate. Considering that additional administrative and legal expenses had to be met by the estate; that a substantial part of the collection was by Dorsett as agent from Dorsett as trustee or from related sources, involving no unusual collection effort on his part, and in light of the other facts detailed above, the allowance approved by the District Judge seems not unreasonable. In comparison with the rates usually applied in receiverships, the overall allowance of six percent plus $31,600 salary would seem to be fair to the agent, if not on the liberal side. A smaller award might well be deemed adequate compensation; yet, we do not consider the allowances made by the Court so excessive as to be clearly erroneous.
 
 
 18
 The objecting stockholders think the sum allowed by the Court is still too large and, especially, they stress the purchases of bank stock by Dorsett and his family. This conduct, the stockholders insist, violated his fiduciary duty and should result in the forfeiture of all right to compensation. In appraising Dorsett's course of conduct, it should, in fairness, be pointed out that these purchases were not from the bank's estate which he was administering, but from others. He gained nothing at the estate's expense. If he profited unfairly by inducing anyone to sell too cheap, it was at the expense of former stockholders who are not here, and not to the detriment of those who are here complaining. Whether or not he overreached in dealing with the stockholders who sold their shares to him, we need not decide. As Dorsett increased his holdings, his motive to realize as much as possible from the liquidation, if anything, spurred his efforts to the advantage of these complainants as well as his own.
 
 
 19
 Without approving of his stock transactions, we would not characterize the agent's conduct, under the circumstances, as "faithless" and "disloyal," or such as to disentitle him to all remuneration. That would be as extreme and inequitable as his unrevised claim. Even if we assumed that there was an unquestionable breach of trust, compensation would not necessarily be denied or even reduced, for the rule is that the matter lies in the Court's discretion upon consideration of all relevant factors. Restatement of the Law of Trusts, Sec. 243. We do not require the profits from the stock transactions to be returned or, to be more exact, turned over to the bank estate, because we think that the District Court, in making "adjustment and settlement," took this feature of the case into account.
 
 
 20
 Likewise, we find no error or inequity in the allowance of interest upon the sum retained in excess of the fees, as determined by the Court. The complaining stockholders argue that the interest allowance should have been for a longer period. The point was mentioned but not extensively argued here; but it is clear that the District Court considered the matter in fixing compensation, and the rule in equity is that interest on an unliquidated claim is ordinarily in the trial court's discretion. See Miller v. Robertson, 266 U.S. 243, 258, 45 S.Ct. 73, 69 L.Ed. 265; Board of County Commissioners of Jackson County v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313; United Light & Power Co. v. Grand Rapids Trust Co., 6 Cir., 85 F.2d 331, 338.
 
 
 21
 No abuse of discretion appears.
 
 
 22
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 This computation was apparently based upon the total of $472,749.91, rather than $481,011.16, the figure mentioned by the District Court, the difference of $8,261.25 being the amount turned over by Dorsett, as Receiver, at termination of the receivership