[No. 12973.   In Bank. — July 1, 1891.]
## EXCELSIOR WATER AND MINING COMPANY, Appellant, *v.* JAMES P. PIERCE, Respondent.

Mining Corporation — Liability of Directors — Making Dividends without Payment of Debts — Surplus Profits — Encumbered Property — Permanent Improvements. — The directors of a mining corporation, which has become indebted by acquiring its property encumbered with debt and by making permanent improvements thereon, are not liable to the corporation merely because they declare and pay dividends out of the net proceeds of the mine without first paying the whole of such debts, and are not thereby guilty of any infraction of section 309 of the Civil Code, prohibiting the making of dividends, except from the surplus profits arising from the business of the corporation.

ID.— CONSTRUCTION OF CODE — DIVISION OF "CAPITAL STOCK"— CODE.— The "capital stock" of a corporation which the directors of the corporation are forbidden to divide, within the meaning of section 309 of the Civil Code, is the actual property of the corporation contributed by the share-holders of the nominal or share capital.

ID.— DIVIDENDS FROM "SURPLUS PROFITS"— NET PROCEEDS OF MINING OPERATIONS — RESERVE FUND.— The inhibition of section 309 of the Civil Code, in regard to the payment of dividends, except from "surplus profits," does not prohibit the payment of a dividend by a mining corporation from the net proceeds of its mining operations, to be ascertained by deducting the gross outlay of current expenses from the gross receipts, and the balance, less a reasonable reserve to meet contingencies, would be the legitimate subject of a dividend.

ID.— DISTRIBUTION OF NET EARNINGS — DIMINUTION OF CAPITAL.— A mining corporation may distribute its net earnings although the value of its mine is thereby diminished; and it is not deemed to have divided its capital, within the meaning of section 309 of the Civil Code, merely because it has distributed the net proceeds of its mining operations.

ID.— BORROWING MONEY TO PAY DIVIDENDS — IMPROVEMENTS WITH SURPLUS PROFITS.— The fact that money was borrowed by the directors of the corporation to pay some of the dividends is not a violation of section 309 of the Civil Code, where it appears that the corporation had used surplus profits, equal in amount to the dividend paid, for the purpose of making needed improvements.

ID.— PAYING ASSESSMENT UPON STOCK HELD IN ANOTHER CORPORATION — INVESTMENT — CURRENT EXPENSE.— The payment, by the corporation, of an assessment for the construction of a tunnel run for the purpose of working the mines of another mining company, of which the corporation was a stockholder, is an investment of capital, and not a current expense.

ID.— UNPROFITABLE INVESTMENTS BY DIRECTORS — LOSS OF CAPITAL.— The fact that a number of the investments made by the directors of the corporation turned out to be unprofitable does not render the directors liable for the loss suffered thereby, where the expenditures were considered judicious when made, and the loss could not have been reasonably anticipated; and the loss must be treated as a loss of capital, and not converted *ex post facto* into a current working expense.

ID.— APPORTIONMENT OF NET EARNINGS OF CORPORATION — DISCRETION OF DIRECTORS.— The apportionment of net earnings of a corporation to the payment of cash dividends, stock dividends, increase of capital, reserve or contingent fund, or to provide for future obligations, is largely one of policy, intrusted to the discretion of the directors, which, when honestly and intelligently exercised, will not be slightly overruled.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*D. M. Delmas,* and *W. S. Goodfellow,* for Appellant.

Section 309 of the Civil Code is simply a re-enactment of well-known common-law principles. (*Van Dyck* v. *McQuade,* 57 How. Pr. 62; Taylor on Private Corporations, secs. 565, 566; 1 Morawetz on Corporations, 2d ed., sec. 435.)   Although designed to protect both creditors and share-holders, the main object of the provision is the protection and security of creditors. (*Kohl* v. *Lilienthal,* 81 Cal. 378; *Martin* v. *Zellerbach,* 38 Cal. 300, 307; 99 Am. Dec. 365.   See also, in this connection, *Williams* v. *Boice,* 28 N. J. Eq. 364, 370; *Flitcroft's Case,* L. R. 21 Ch. Div. 520, 533, 534; Morawetz on Corporations, secs. 780, 781.) The " capital stock " of a corporation, as the term is employed in section 309 of the Civil Code, is the fund on which it transacts its business, and is not confined merely to the assets and possessions of the company at the date of incorporation, but embraces all subsequent accretions or additions which are made to the original investment. (*Kohl* v. *Lilienthal,* 81 Cal. 378, 385; *Martin* v. *Zellerbach,* 38 Cal. 308; 99 Am. Dec. 365; *The Ordinary* v. *Central etc. R. R. Co.,* 40 Ga. 646, 650.   And see further, as to the meaning of "capital stock," *San Francisco* v. *Spring Valley Water Co.,* 63 Cal. 529 et seq.; *Williams* v. *Western Union Tel. Co.,* 61 How. Pr. 216, 219– 221.)   If the directors, instead of distributing the surplus profits, apply them to the extension of the business, and with them purchase new properties or plant, necessary and proper to the fulfillment of the corporate objects, they thereafter lose their character as profits, and cannot be treated as such for the payment of dividends, or for any purpose. (*Minot* v. *Paine,* 99 Mass. 101, 111; 96 Am. Dec. 705, and cases cited; Morawetz on Private Corporations, secs. 437, 447, 452.   See further, in this connection, *Matter of Barton's Trust,* L. R. 5 Eq. Cas. 238, 243, 245; *Rand* v. *Hubbell,* 115 Mass. 461, 474; 15 Am. Rep. 121.)   Dividends cannot be declared unless on the basis of money or funds actually on hand and in possession of the

treasurer of the corporation. (*People* v. *San Francisco Savings Union,* 72 Cal. 199; *Davis* v. *Flagstaff Silver Min. Co.,* 2 Utah, 74, 87–89; *Lexington etc. Ins. Co.* v. *Page,* 17 B. Mon. 412; 66 Am. Dec. 165.) Dividends cannot properly be declared when a corporation is heavily indebted and embarrassed, and especially out of money expressly borrowed, as it was here, for the purpose of paying them, thus still further increasing the corporate debt. This is a breach of the trust relation which the directors owe to the corporation and to its creditors. Dividends cannot be declared even out of profits, unless with a due regard to the indebtedness of the corporation, both present and prospective. (Morawetz on Private Corporations; secs. 438, 442, 460. See also *Davis* v. *Flagstaff Silver Min. Co.,* 2 Utah, 74; *In re Alexandra Palace Co.,* L. R. 21 Ch. Div. 149; *Barnard* v. *Vermont,* 7 Allen, 512, 520–522; *Elkins* v. *Camden,* 36 N. J. Eq. 233, 238.) The declaring of fictitious dividends gives a false credit to the company. It is an assertion that the corporation is prosperous, when in fact it may be insolvent and embarrassed, and is a fraud, and highly reprehensible. (*Martin* v. *Zellerbach,* 38 Cal. 300, 318; 99 Am. Dec. 365; *Lockhart* v. *Van Alstyne,* 31 Mich. 76, 79, 80; 18 Am. Rep. 156; *Burnes* v. *Pennell,* 2 H. L. Cas. 497, 524, 531.) Even if the dividend be declared in good faith, the directors are still responsible, either for their negligence, or their want of capacity in the determination of what were properly profits, and capable of division as dividends. (*Lexington etc. Railroad Co.* v. *Bridges,* 7 B. Mon. 556.) The directors of a corporation are bound to know its condition at the time of the declaration of a dividend. They cannot screen themselves from responsibility by showing that they acted with good intentions, and in the honest belief that there were sufficient assets, or that certain items were proper factors upon which to base a dividend; and if a dividend is in fact improperly declared, they all and each of them must abide by the conse-

quences. (*Clay* v. *Towle*, 78 Me. 86, 89; *United Society* v. *Underwood*, 9 Bush, 609, 621; 15 Am. Rep. 731; *German Savings Bank* v. *Wulfekuhler*, 19 Kan. 60, 63, 64; *Osgood* v. *Laytin*, 3 Keyes, 521–523; 5 Abb. Pr., N. S., 1, 9; *Gaffney* v. *Colvill*, 6 Hill, 568, 576.)

*Olney, Chickering & Thomas,* for Respondent.

The net earnings or surplus earnings of a corporation or individual is what is left from the gross earnings after deducting the working expenses necessary to produce the gross earnings, and the expenses incurred in the construction of works, or in equipping and enlarging them, are not to be taken into consideration in the estimation of the net earnings. (*Union Pac. R. R. Co.* v. *United States*, 99 U. S. 420; *Goodwin* v. *Hardy*, 57 Me. 143; 99 Am. Dec. 762, and cases cited. See *Corry* v. *Londonderry etc. R. R. Co.*, 29 Beav. 263; *People* v. *Supervisors*, 4 Hill, 20.) The fact that the earnings of the corporation had been invested in betterments did not prevent the division of their cost among the stockholders. (*Williams* v. *Western Union Tel. Co.*, 93 N. Y. 180 et seq.; *Park* v. *Grant Locomotive Works*, 40 N. J. Eq. 114; *Stringer's Case*, L. R. 4 Ch. App. Div. 475; Morawetz on Corporations, secs. 438, 439.) It was proper to pay dividends from the proceeds of the mine without attempting to keep up the value of the mine. (*Lee* v. *Neuchatel Asphalte Co.*, L. R. 41 Ch. Div. 1; 1 Morawetz on Corporations, sec. 442, and see also sec. 830.)

BEATTY, C. J. — This is an action by a California corporation against one of its former directors to recover the amount of certain dividends declared and paid to its stockholders with the concurrence of the defendant while a director. It is alleged by the plaintiff that such dividends were not paid out of the surplus profits of its business, and the action is based upon the provisions of section 309 of the Civil Code, which reads as follows: —

"Sec. 309. The directors of corporations must not make dividends, except from the surplus profits arising from the business thereof; nor must they divide, withdraw, or pay to the stockholders, or any of them, any part of the capital stock; nor must they create debts beyond their subscribed capital stock, or reduce or increase the capital stock, except as hereinafter specially provided. For a violation of the provisions of this section, the directors under whose administration the same may have happened (except those who may have caused their dissent therefrom to be entered at large on the minutes of the directors at the time, or were not present when the same did happen) are in their individual and private capacity jointly and severally liable to the corporation, and to the creditors thereof, in the event of its dissolution, to the full amount of the capital stock so divided, withdrawn, paid out, or reduced, or debt contracted; and no statute of limitations is a bar to any suit against such directors for any sums for which they are made liable by this section. There may, however, be a division and distribution of the capital stock of any corporation which remains after the payment of all its debts, upon its dissolution, or the expiration of its term of existence."

The complaint counts upon nineteen separate dividends, aggregating about two hundred and sixty-six thousand dollars, but it appearing that the defendant had ceased to be a director before the last dividend was paid, plaintiff limits its claim to the first eighteen.

As to these there is but one question to be decided here: Were they, or were they not, paid out of the surplus profits of the plaintiff's business? To this issue the attention of the superior court seems to have been confined, and in reviewing its decision it will not be necessary for us to consider any question relating to the special defense interposed by defendant to some of the separate counts upon particular dividends. Aside from this special defense, the only matter put in issue by the

pleadings of the parties was that above stated; and the superior court having found that all the dividends were in fact paid out of surplus profits, its judgment was given in favor of the defendant upon that ground alone. The plaintiff appeals from the judgment, and from an order denying its motion for a new trial. The record upon which the decision of the superior court is to be reviewed is exceedingly voluminous, and consists in great part of tabulated statements and accounts intended to show the gross earnings, the current and other expenses, of the plaintiff, the amount and nature of its assets and indebtedness, and, in short, the exact condition of its affairs at the date of each of the eighteen dividends in question. We are, however, spared the labor of deducing for ourselves the results of these involved and conflicting statements by reason of the fact that counsel for both parties have agreed to accept the results stated by the learned judge of the superior court in an opinion filed by him in connection with his decision of the cause, and which has been included in the transcript of the record.

It appears therefrom that the plaintiff was incorporated in March, 1877, with a nominal or share capital of five million dollars, divided into fifty thousand shares of one hundred dollars each. The object of the incorporation was to carry on hydraulic mining, etc., and the defendant was, from the beginning down to September, 1879, a stockholder and director in the company. In April, 1877, plaintiff acquired all the property of the Excelsior Water Company, consisting of mining-ground, farm, ditches, flumes, store and merchandise, stock in other mining companies, bills, notes, bullion in flumes, etc., giving in exchange 36,732 shares of stock, and shortly afterwards it obtained a like conveyance and transfer of all the property of the Pactolus Mining Company in exchange for 3,000 shares of its stock. These,

with a few others, amounting in all to 39,809 shares, were the only shares ever issued by plaintiff.

The Excelsior Water Company and Pactolus Mining Company were largely indebted at the time they transferred their property to plaintiff, and this indebtedness was assumed by plaintiff as a part of the purchase price of the property. Its net amount, over and above the solvent credits transferred by the two companies, was $173,710.80, which was paid during the directorship of the defendant. During the same time the sum of $233,-723.60 was expended by plaintiff in the purchase of other mining property, the construction of ditches, tunnels, permanent improvements on farm, machinery on mine, procuring United States patents for mining-ground, and in assessments on stock in other companies.

During the same time the plaintiff was carrying on its mining and other multifarious business, and it received from sale of bullion and water, and as profits of its store and farm and other investments, the gross sum of $1,095,719, while its outlay for operating its mines, salaries, taxes, interest, and other strictly current expenses was $638,303, leaving a balance of earnings of $457,416. The amount of the eighteen dividends declared and paid during this time was only $241,629, or $215,724 less than the net earnings.

But the plaintiff contends that the surplus profits were only about ninety-eight thousand dollars, and that about one hundred and forty-three thousand dollars over and above the surplus profits were divided, while the defendant claims that much less than the surplus profits was divided.

This difference betwen counsel for plaintiff on the one side, and the superior court and counsel for the defendant on the other, arises out of a difference of theory as to what constitutes surplus profits of a mining corporation.

Counsel for plaintiff contends that the payment of the

debts which plaintiff assumed as part of the price of the property acquired from the Excelsior Water Company and the Pactolus Mining Company, as well as most of the items of expenditure for construction of tunnels, levees, ditches, etc., should be rated as current expenses and charged against its gross earnings, in order to ascertain the actual surplus profits of its business; while counsel for defendant contends, on the contrary, that the payments of the principal of its indebtedness, and its investments in what are called betterments of its property, should not be charged to current expenses of the business.   As to the payment of the debt assumed by the plaintiff when it commenced business, or that incurred in making improvements, we do not understand its counsel to contend that it was necessary to pay them off before any dividends could be declared, but merely that whenever any part of its gross earnings was applied to the payment of a debt it was unlawful thereafter to replace such sum with the proceeds of a loan, and thereupon declare a dividend.

The fact is not disclosed by the opinion of the judge of the superior court, but it seems to have been proved, that in several instances money was borrowed by the plaintiff in order to pay dividends, and it seems to have happened in this way: The debts assumed by the plaintiff became due from time to time, and the permanent improvments on its property were made from time to time, so that large payments on both accounts were constantly occurring.   Instead of borrowing money to make such payments at the time of making them, any money that happened to be on hand in the company's treasury was used as far as it would go, and afterwards replaced by the proceeds of bonds, overdrafts, or notes of the company, which, to the extent necessary, were used to pay the regular dividends.   It is in this course of proceeding that counsel claims that defendant was clearly guilty of a violation of section 309 of the Civil Code,

irrespective of any difference of views as to what are and what are not current expenses justly chargeable against the gross receipts of a mining corporation, in order to determine its net or surplus earnings or profits. To determine the question presented by this aspect of the case it will be necessary, in the first place, to lay down some general propositions which we think are clearly established by the authorities to which we shall refer.

The term "capital stock" has a double meaning, as applied to corporations. In one sense it is the sum mentioned in the articles of incorporation as the amount of the capital stock; in other words, it is the share capital, or nominal capital, and does not necessarily represent a corresponding amount of actual capital. In case of mining corporations, it is always arbitrary and generally extravagant in amount.

The capital stock referred to in the statute, however, (Civ. Code, sec. 309) is the actual property of the corporation contributed by the share-holders of the nominal capital. In this case the nominal or share capital of the plaintiff was five million dollars. Its actual capital was its mining and other property (less the debt with which it was encumbered) received in exchange for the shares which it issued, and this actual capital was what it was forbidden to divide.

This inhibition, however, did not extend to the net proceeds of its mining operations; for a mining corporation, like any other corporation organized for the purpose of utilizing a wasting property, — a property that can be used only by consuming it, — as a mine, a lease, or a patent, is not deemed to have divided its capital merely because it has distributed the net proceeds of its mining operations, although the necessary result is that so much has been subtracted from the substance of its estate. (Morawetz on Corporations, sec. 442; *Lee* v. *Neuchatel Asphalte Co.*, L. R. 41 Ch. Div. 24.) It may distribute its net earnings, although the value of its mine is

thereby diminished.  But it may not sell the mine, or any part of it, and distribute the proceeds.  In this sense, and in this sense only, provisions of law similar to those of section 309 of our Civil Code have been held to apply to mining corporations.

If the mine belonging to a mining corporation when it commences operations is free from debt, and provided with all the necessary openings and appliances for its convenient working, the problem of ascertaining the amount of its surplus profits from time to time would be very simple, and would consist in merely deducting the gross outlay from the gross receipts, and the balance, less a reasonable reserve to meet contingencies, would be the legitimate subject of a dividend.  But when the mining property has been taken subject to a debt, or when as a preliminary operation it becomes necessary to incur a debt in running an expensive tunnel or sinking an expensive shaft, the problem becomes complicated.  Must the whole of such debts be paid out of the first earnings, before making a dividend? or must only a part be paid? and if so, what part?

We do not think it would be necessary to pay, in the first place, the whole of such debts, but it would be necessary to pay accruing interest, and to provide a sinking fund sufficient to extinguish the principal before the mine was exhausted.  There can be no doubt, we think, that this is a correct theory; but in case of a property of such uncertain, fluctuating, and precarious value as a mine, it would undoubtedly be extremely difficult in most cases to practically apply it.  Fortunately, however, the right of the creditors to insist upon payment of their demands as they fell due, and the prudence of capitalists to whom the company would be compelled to resort for loans with which to extend the payment of its maturing indebtedness, would always furnish a sure corrective for any disposition of the directors of a corporation to provide an inadequate fund for the extinguishment

of its indebtedness, and it may be safely assumed that in
the case supposed, unless the debts of the corporation
were paid at a rate satisfactory to its creditors, they would
put a stop to the payment of dividends by the means
within their power.    At all events, we are clear that the
directors of a mining corporation, which has become in-
debted either by acquiring its property encumbered with
debt, or by making permanent improvements for the
thorough and systematic working of its mines and other
property, are not guilty of an infraction of section 309 of
the Civil Code merely because they declare and pay divi-
dends out of the net proceeds of their mine without first
paying the whole of such debts.

On the contrary, if they have fairly and honestly ap-
plied towards the payment and extinguishment of the
debts of the company a share of the net earnings satis-
factory to its creditors and reasonably proportioned to
the amount of its indebtedness, the extent and perma-
nence of its mine, or the rate at which it is being ex-
hausted, they may properly and safely pay out the
remainder in dividends, because such remainder may
in such cases be justly regarded and treated as surplus
profits of the business.

Now, in this case, it appears that out of the net earn-
ings, amounting to four hundred and fifty-seven thou-
sand dollars (I use round numbers for the sake of brev-
ity), only two hundred and forty-one thousand dollars
were paid in dividends, while two hundred and sixteen
thousand dollars, or nearly one half, was applied in pay-
ment of the debts of the corporation, originally assumed
in the acquisition of its capital stock, and afterwards in-
curred in making permanent improvements thereon.

It further appears that a large and valuable part of
plaintiff's capital consists of property other than its
mining-ground, which will remain after the mine is
exhausted, and there is evidence in the record, though
there is no finding to that effect, that the mine itself has

been but slightly encroached upon. It does not appear that any creditor has been defrauded, or his claim even endangered, and, in short, there is nothing to show that the capital of plaintiff has been impaired. True, its debt has increased, but not in an amount equal to the value of its betterments.

The fact, however, remains that money was borrowed to pay some of the dividends, and the question remains whether such a course admits of justification.

We think there are circumstances which do justify it.

A mining company is working its mines at a profit, but discovers that they can be worked to better advantage by constructing a new tunnel; that is to say, it will be wise economy to incur an expense of, say, a hundred thousand dollars to construct such a tunnel; that it will in fact add more than that sum to the value of the property. Clearly, we think, the corporation would be justified in incurring a debt to that amount to carry out the object, and that it could go on declaring dividends after providing for the payment of the accruing interest, and for the gradual extinction of the principal of such debt.

But suppose, instead of borrowing in advance to meet payments on the tunnel, it makes some of the payments out of the current profits of its mining operations,— profits justly applicable, at its option, to the payment of dividends, but not presently needed to meet a declared dividend. Afterwards it borrows money, no more than it might have borrowed originally on account of the tunnel, and out of the money so borrowed replenishes the fund applicable to dividends. In such a case the result is precisely the same as if the money had been borrowed sooner, and the identical money borrowed paid out on the tunnel. Nothing has been accomplished beyond what the directors had a right to do, and surely the mode in which it has been done can make no difference. In fact, the transaction may be regarded as a temporary

borrowing from the dividend fund of a sum necessary to meet an immediate demand, with the advantage to the corporation of keeping its money employed and saving it the payment of interest.

If the general results stated by the superior judge in his opinion, and accepted by counsel, are correct, the defendant in this case did nothing more than borrow from the fund applicable to the payment of dividends in the manner outlined above, or if it was the earlier rather than the later dividends that were paid with borrowed money, then such borrowed money was finally repaid out of the dividend fund. For, taking the whole period covered by the declaration of the eighteen dividends, it appears that no more than the legitimate surplus profits were divided.

We say that this fact appears, but we do not lose sight of the fact that counsel for appellant insists upon his contention that one hundred and forty-three thousand dollars in excess of surplus profits was divided, and it is proper that we should state more specifically the ground of our contrary opinion.

To make up this sum of one hundred and forty-three thousand dollars, counsel for plaintiff in his estimate of net earnings or surplus profits includes in his current expense account a number of large items which we think are improperly there, or to speak more accurately, there is evidence to sustain the finding of the superior court (implied in its general finding) that they are improperly there.

We need specify only two of these items, viz: —

Assessments Deer Creek Tunnel . . . . . . . . . . .$113,295.55
Machinery and Blue Gravel Branch Tunnel.. 43,962.65

Making a total of . . . . . . . . . . . . . . . . . . . .$157,258.20

— which more than overbalances the one hundred and forty-three thousand dollars which plaintiff claims to have been paid out of capital or borrowed money.

Plaintiff was a stock-holder in the Deer Creek Company, and paid its assessments for the construction of its tunnel run for the purpose of working its mines. Clearly, this was an investment of capital, and not a current expense. The other item mentioned stands on similar grounds, and so do a number of others, aggregating a large amount which we have not mentioned.

It is argued by plaintiff that a number of these investments turned out to be unprofitable in the end, and reference is made to the fact, disclosed by the evidence in this case, and otherwise notorious, that all these hydraulic mines have been shut up by injunction sued out by the riparian proprietors on the streams into which they were washing their earth. This is undoubtedly a serious misfortune to the present stockholders in the various companies, including the plaintiff, but the defendant is not responsible for the losses they may have suffered in consequence of the injunctions, nor is the wisdom or the prudence of his investments to be measured by a result which at the time few persons anticipated. When the expenditures were made they were, no doubt, considered judicious, and if the event has proved the contrary, the result must be treated as a loss of capital, and the expenditures must not be converted *ex post facto* into a current working expense.

It is proper, in conclusion, to refer to some of the authorities which support the positions herein assumed.

For a definition of net earnings used in the sense of surplus profits, we refer to *Union Pacific R. R. Co.* v. *United States*, 99 U. S. 420; note to *Goodwin* v. *Hardy*, 99 Am. Dec. 762.

The case in 99 United States and *Park* v. *Grant Locomotive Works*, 40 N. J. Eq. 113, and *Minot* v. *Paine*, 99 Mass. 101, 96 Am. Dec. 705, are also authority for the proposition that the apportionment of net earnings to the payment of cash dividends, stock dividends, increase of capital, reserve or contingent fund, or to provide for

future obligations, is largely one of policy, intrusted to the discretion of the directors, which, when honestly and intelligently exercised, will not be lightly overruled. (See also *Stringer's Case*, L. R. 4 Ch. App. Div. 490, and *Williams* v. *Western Union Tel. Co.*, 93 N. Y. 162.)

The case of *Minot* v. *Paine*, 99 Mass. 101, 96 Am. Dec. 705, is cited by counsel for plaintiff to sustain his proposition that money of a corporation when once expended in the purchase of new capital, or in improvements, can never be reclaimed for the purpose of paying dividends. We do not think it sustains the proposition. It goes only to the extent of holding that a trustee of shares for the purpose of paying the income to A during life, and the principal to B on the death of A, holds additional shares issued as a stock dividend subject to the same disposition. It rests upon the ground that such is the only safe rule for a trustee, rather than upon the justice of the rule, which is very questionable. But conceding its correctness upon the point decided, it does not hold that surplus capital cannot be used for making cash dividends, but, on the contrary, expressly holds that while it can never be regarded as income of the stockholders until converted into a dividend, it may, nevertheless, be income to the corporation, and, as such, the subject of a dividend in the discretion of the directors.

We find no error in the record.

Judgment and order affirmed.

McFARLAND, J., SHARPSTEIN, J., and PATERSON, J., concurred.

The other justices of the court, not having heard the argument, did not participate in the decision.

Rehearing denied.