

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,103

### OTIS TYRONE McKANE, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 2017CR1505 IN THE 379TH DISTRICT COURT BEXAR COUNTY

MCCLURE, J., delivered the opinion of Court in which SCHENCK, P.J., RICHARDSON, NEWELL, KEEL, WALKER, FINLEY and PARKER, J.J., joined. YEARY, J., concurs as to part III and otherwise joined.

## O P I N I O N

In August 2021, a jury convicted Appellant, Otis Tyrone McKane, of capital murder for intentionally or knowingly causing the death of a peace officer who was acting in the lawful discharge of an official duty. *See* TEX. PENAL CODE § 19.03(a)(1). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to

death. *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises nine points of error. We affirm the trial court's judgment of conviction and sentence of death.

On November 20, 2016, around 7:40 a.m., Kevin Wilkinson was working the front desk at San Antonio Police Department (SAPD) headquarters when Appellant came in to report a "visitation violation" related to a child custody issue. Wilkinson called for an officer to come take a report, but no one answered the phone. Wilkinson offered to call an officer in from the streets to take the report, but Appellant said "never mind" and walked off. Because he thought the encounter was unusual, Wilkinson set the security cameras to follow Appellant as he left the building and drove away in his vehicle.

Around 11:30 a.m. that morning, Appellant drove back to police headquarters and circled the block. At that time, SAPD Detective Benjamin Macroni was sitting in a patrol car in front of the building writing a traffic ticket. Appellant pulled up behind Macroni's patrol car, got out of his vehicle, jogged up to Macroni, and shot him in the head. Appellant ran back to his vehicle and drove off. Macroni died within the hour.

Police obtained a warrant to arrest Appellant for capital murder and SAPD SWAT team officers arrested Appellant around 5:00 p.m. the next day.

## I.    MOTION TO SUPPRESS APPELLANT'S STATEMENTS

In his first four points of error, Appellant claims that the trial court erred in denying his motions to suppress various statements he made following his arrest. Appellant filed a pretrial motion for a hearing on the voluntariness and admissibility of

any statements. *See Jackson v. Denno*, 378 U.S. 368 (1964) (holding criminal defendant is entitled to fair determination of voluntariness of his confession outside presence of jury). The trial court held a hearing and issued findings of fact and conclusions of law. *See* Art. 38.22 § 6.

Members of the SAPD SWAT team testified at the hearing that due to the view that Appellant was a "high-risk" suspect, the SWAT team was tasked with his arrest. Officer Daniel Elborne testified that the SWAT team decided to deploy a "diversionary device" in apprehending Appellant who had been located driving a vehicle along an interstate access road. He explained that such devices are used to distract the suspect, giving officers a tactical advantage when approaching. He added that such a device "stays in the general vicinity of where it lands, and after [a] second-and-a-half delay, you get a very loud bang and a very bright flash."

Elborne testified that after stopping and boxing in Appellant's vehicle, they deployed the diversionary device. Officers instructed Appellant to put his hands up to his face, which he did. Elborne testified that he reached into the vehicle and secured one of Appellant's hands, unlatched the seat belt, removed Appellant from the vehicle, and placed him face down on the ground where officers handcuffed him. Officers conducted a quick pat-down search for weapons, then moved him against the hood of a patrol vehicle for a more thorough pat-down before placing him in the back of a patrol car. Elborne denied slamming Appellant to the ground, saying that Appellant was compliant so there

was no need to use force. He also denied that any officers fired shots and testified that he did not hear any officers threaten to shoot Appellant.

Officer Chris Enfinger, another SWAT team member, expanded on Elborne's description of the arrest. Enfinger said four officers approached each side of the vehicle and commanded the occupants to put their hands on their faces.[2] Enfinger confirmed that Appellant was compliant and that there was no use of excessive force. He also testified that none of the officers fired a shot or threatened to shoot Appellant. Enfinger and another officer ultimately transported Appellant to the police station. Enfinger said that there was no conversation between the officers and Appellant en route. Upon arrival at the station, Enfinger took Appellant to an interview room and waited while a homicide detective interviewed Appellant. After the interview, Enfinger and another officer escorted Appellant back to a patrol vehicle to drive him to a detention center where he would be booked and appear before a magistrate. As they left the building, Appellant made statements to members of the media who were outside. A clip of this exchange was admitted into evidence and played. Enfinger testified that the ride to the detention center was silent, but that as they walked Appellant into the center, Appellant made several comments: "I'm glad that I shot him," "you can't judge me," "it felt good to do what I did," and "I finally got someone to listen." Enfinger said that Appellant did not make the statements in response to anything asked or stated by the officers.

---

[2] There was testimony that two other persons were in the vehicle, a woman in the front passenger seat and a child in the back seat.

Parker Morris testified that he was working as a detention guard at the magistrate's office when Appellant was brought in for booking. He asked Appellant four required mental health questions, none of which Appellant responded to. However, while Morris was searching Appellant and taking his book-in photo, Appellant stated under his breath, but loud enough for Morris to hear, "it felt good to shoot him." Morris said the statement was not made in response to a question asked by Morris or anyone else at the time.

Elroy Brown, a licensed clinical social worker, was working for University Hospital at the Bexar County Jail as a mental health assessor and supervisor when Appellant was referred to him for an assessment a couple of days after his arrest. Brown testified that the purpose of such an assessment is to determine whether the inmate poses a danger to themselves or others, or if the inmate has a history of mental health issues. Brown stated that he was not employed by law enforcement or working as their agent or at their direction. Brown testified that during the course of the assessment, Appellant told him about "his mindset at the time" of the offense and "why he did what he did," including that Appellant felt his actions were an attack on the system, not the individual:

> The uniform. He said he shot an officer. Or I may have asked him why did he shoot the officer, and didn't deny [it], but he did mention that, you know, at the time it was just the uniform really that he was after. And, you know, basically, you know, I didn't know him, I didn't - - I mean I feel bad for his family, I feel bad for him, but I just felt I wasn't being heard. He mentioned about his custody with his child, that every time he would not pay child support, that, you know, he would have the threat of going to jail . . . . [H]e said he was just . . . targeting the system with that, you know, he just seen [sic] the uniform and it was just kind of a random choice of an officer in uniform.

Finally, SAPD homicide detective Mark Duke testified that he was the lead detective on the case and interviewed Appellant at headquarters after his arrest. The interview was video-recorded and lasted around two hours. The recording was admitted as State's Exhibit No. 1 for purposes of the hearing. Duke testified that he removed his weapon and badge before entering the interview room in order to be less intimidating. He informed Appellant of his rights, and Appellant stated that he understood them. Appellant began to complain to Duke that he was mistreated during his arrest, so Duke brought in Deputy Chief MacKay to listen to Appellant's complaints. Appellant told Duke and MacKay that the officers who arrested him did not read him his rights, and that he was upset that he had been forced to the ground and onto the hood of a vehicle. He also claimed that he thought he had been fired at by officers. MacKay assured Appellant that his complaints had been heard and would be considered. MacKay also verified with Appellant that he had been read his rights by Duke and understood them. MacKay left the room and Duke resumed the interview. Eventually, Appellant asked if he had been charged with anything. Duke told him that he had not been formally charged, but that they had a warrant for his arrest for capital murder. Duke testified that after hearing this, Appellant admitted to shooting Macroni. Appellant said he committed the shooting to "avenge society for what they have done to him." Duke said that Appellant told him that he wanted the police department "to feel the burn that he felt in his heart." Appellant further said he lashed out and shot the first officer he saw.

Appellant argued at the hearing that his statements to Duke were involuntary as a result of being placed in fear and mistreated during his arrest and being misled to believe that the police would investigate his complaints. Appellant also argued that although Duke read him his rights, he did not ask Appellant if he was voluntarily waiving them. The trial court rejected Appellant's claims and concluded that Appellant's statements to Duke were freely and voluntarily made. It found that whatever promises were made by Duke were not of such an influential nature as to cause Appellant to speak untruthfully or involuntarily. The court also found that there was no overreaching or coercive conduct by the arresting officers that caused Appellant's statements to be involuntary, that Duke gave Appellant proper warnings, that Appellant understood them, and that the entire interview was recorded.

Appellant also argued that evidence of the other three instances in which he made statements was not admissible because he was not read his *Miranda* warnings before making those statements. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The trial court found that the statements overheard by Enfinger and Morris were freely and voluntarily made and were not the result of custodial interrogation. Regarding Appellant's statements to Brown, the trial court found that Brown was not acting as a law enforcement agent when he was talking with Appellant; as such, *Miranda* warnings were not required because the statements were not the result of custodial interrogation. The court ruled that all of the statements were admissible.

In his first point of error, Appellant claims the trial court erred to deny his motion to suppress the statements he made to Detective Duke. He contends that under the totality of the circumstances, he did not knowingly, intelligently, and voluntarily waive his rights. *See Moran v. Burbine*, 475 U.S. 412 (1986) (to determine if accused knowingly, intelligently, and voluntarily waived *Miranda* rights, reviewing court looks at totality of circumstances to determine if waiver was free and deliberate and not caused by intimidation, coercion, or deception). Appellant contends that he was mistreated during his arrest. He says he was forced to the ground, slammed onto the hood of a car, and was shot at by police. He claims that twelve guns were pointed at him, that he was fired at by a shotgun, and that he thought he was going to die. He complains that he remained in handcuffs while waiting in the interrogation room for over an hour before Duke entered and then was interrogated by Duke for over two hours. He says Duke appeared to take his complaints about the arrest seriously and said he would investigate them, which led Appellant to believe the police would help him. Duke never asked Appellant if he waived his rights. Appellant maintains that the totality of these circumstances led to a waiver of his rights that was not knowing, intelligent, and voluntary.

The State bears the burden of proving a knowing, intelligent, and voluntary waiver by a preponderance of the evidence. *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). A voluntary waiver is "the product of a free and deliberate choice rather than intimidation, coercion, and deception." *Id.* at 25 (quoting *Moran*, 475 U.S. at 421). A waiver is knowing and intelligent when "made with full awareness of both the nature of

the right being abandoned and the consequences of the decision to abandon it." *Id.* A trial court may infer a waiver from an interrogation suspect's words and actions. *Id.* at 24. In determining whether a waiver was given freely and voluntarily, a trial court considers the totality of the circumstances. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007) (noting well-established Texas law that confessions are evaluated with totality of circumstances standard).

We conclude that Appellant's claim has no merit. Given the nature of Appellant's crime— the sudden and unprovoked shooting of a police officer in public— his arrest was handled in an appropriate manner without the use of unnecessary force. Police had no way to know Appellant's motivation in shooting Macroni, his intentions towards other officers, or whether he still had a weapon. The SWAT team's use of the diversionary device allowed the officers some cover in approaching Appellant's vehicle. Although Duke testified that the noise caused by the device probably accounted for Appellant's belief that he was being fired at, there is no evidence that the device injured Appellant. Further, Duke testified at the hearing that Appellant did not claim to be injured from anything that occurred during the arrest. Officers who were at the scene, found credible by the trial court, testified that Appellant was compliant and that they did not use excessive force in removing him from his vehicle and patting him down. They consistently testified that none of the officers fired shots or threatened to shoot Appellant. The officers' conduct in carrying out Appellant's arrest was restrained and appropriate; it did not create or contribute to an atmosphere of coercion or intimidation in Appellant's

interview several hours later. *Cf. Berry v. State*, 582 S.W.2d 463, 464-65 (Tex. Crim. App. 1979) (threats by arresting officer to "blow [the appellant's] head off" and warnings that the appellant would be beaten in prison did not render confession involuntary where the appellant was not threatened or abused by officers who transported him or by officer who took his confession an hour and a half later).

Further, Appellant's continued detention in handcuffs during the police interview was reasonable given the nature of the crime that had occurred.[3] Duke's approach was respectful and calm. He gave Appellant his glasses and got him some water with a straw. Duke was not wearing his weapon. Duke's and MacKay's statements about looking into Appellant's claims regarding his arrest were made in an effort to establish rapport and a sense of understanding toward Appellant. Any indication by the officers that they would investigate the circumstances surrounding Appellant's arrest was not tied to receipt of a confession, nor did the officers create a false hope that Appellant would receive a lighter sentence or a reduced charge if his arrest was somehow determined to be problematic. Any expressions of concern by the officers about Appellant's complaints were not the sort of alleged promises or misrepresentations that operated to overbear Appellant's will and bring about a confession that was not freely given. *See Green v. State*, 934 S.W.2d 92, 99-100 (Tex. Crim. App. 1996) (alleged misrepresentation must be viewed in the

---

[3] Although Appellant only complains about being handcuffed in the interview room while waiting for Duke, the video reflects that Appellant remained handcuffed throughout his interview with Duke.

context of the totality of the circumstances and "[t]he focus is on whether the behavior of the State's law enforcement officials was such as to overbear the will of the accused and bring about a confession not freely determined").

Finally, Appellant complains that Duke did not ask him whether he was waiving his rights. But an express waiver is not required. *See Joseph*, 309 S.W.3d at 24. Waiver can be inferred from the actions and words of the person interrogated. *Id.* Here, Appellant stated to Duke and again to MacKay that he understood his rights. He engaged in the interview in a conversational manner. Before Appellant confessed, Duke told him that he was arrested for capital murder. It can be inferred from these circumstances that Appellant waived his rights.

The totality of the circumstances surrounding Appellant's arrest and interrogation, including the police officers' conduct at the scene of the arrest and during the interrogation, did not by any stretch approach a level of coercion or intimidation that would overcome Appellant's will so as to undermine the reliability of his confession and render it involuntary. We overrule point of error one.

In his second point of error, Appellant claims that the trial court erred by failing to suppress statements he made to Elroy Brown. As set out above, Appellant was referred to Brown a day or two after his arrest for a mental health assessment. During the assessment, Appellant told Brown that in shooting the officer, he was attacking a system that he felt had personally wronged him, not attacking the officer personally. The trial court ruled the statements admissible upon finding that Brown was not operating as law

enforcement and therefore the statements were not made in the context of custodial interrogation.

Appellant argues that Brown was, in fact, acting as a State agent and therefore should have advised Appellant of his *Miranda* rights before questioning him. Even assuming, *arguendo*, that Brown was acting as a State agent and the statements Appellant made to him in the absence of *Miranda* warnings should not have been admitted, any error in admitting them was harmless beyond a reasonable doubt on this record. *See Chapman v. California*, 386 U.S. 18, 24 (1967); *Beck v. State*, 712 S.W.2d 745, 747 (Tex. Crim. App. 1986). Appellant made statements of similar substance to Duke during his interrogation. Appellant told Duke that the shooting was to avenge societal wrongs Appellant felt he had suffered.

In addition, the evidence of Appellant's guilt was largely uncontested, and Appellant's irrationally vengeful motivation was reflected elsewhere in the evidence. The evidence included Appellant's pre-shooting visit to headquarters about his custody situation. Almost four hours later, Appellant shot Macroni in what appeared to be an unprovoked and random act of violence against law enforcement. Wilkinson identified Appellant as the person who entered the lobby with a custody complaint the morning of the shooting. Multiple eyewitnesses identified Appellant as the shooter. Appellant confessed to the murder, explaining that he wanted to avenge society for his own perceived suffering. Any possible error in the admission of Brown's testimony about

Appellant's statements to him regarding the motivation behind his actions was harmless beyond a reasonable doubt. We overrule point of error two.

In point of error three, Appellant claims the trial court erred in failing to suppress statements he made to detention guard Parker Morris when Appellant was brought in for booking. Appellant argues that Morris's questioning during the booking process amounted to a custodial interrogation. He points out that after Duke interrogated him for over two hours, he was escorted to the detention center by multiple police and SWAT officers at 9:00 p.m. Appellant describes Morris as "a uniformed detention officer at the magistrate court at the detention center" who ordered Appellant to stand on a line to be searched and who questioned Appellant as multiple officers stood about ten feet away. Morris did not read Appellant his rights, and Appellant says his statement was made during Morris's questioning of him.

Morris testified that everyone who is booked in at the magistrate's office is asked the same four mental health questions as part of the administrative booking process.[4] When officers brought Appellant in, Morris asked him whether he had any contraband or anything that would hurt Morris or another officer, then asked Appellant the four mental health questions. Morris testified that according to his report, Appellant did not respond to any of these questions. Morris testified that while he was in the process of searching

---

[4] Morris testified that the four questions asked were: (1) Have you been diagnosed with having a mental illness? (2) Have you ever or are you currently taking medication for mental illness? (3) Have you ever tried to kill yourself? (4) Are you currently having thoughts of killing yourself?

and photographing Appellant, Appellant said under his breath, but loud enough for Morris to hear, "[I]t felt good to shoot him." While Morris could not remember whether Appellant made the statement before or after he asked the four administrative mental health questions, Morris was unequivocal in saying that the statement was not made in response to any of the questions Morris asked and that neither he nor anyone else was talking to Appellant at the time.

"[V]olunteered statements are not barred by *Miranda*, even when the accused is in custody." *Pugh v. State*, 624 S.W.3d 565, 568 (Tex. Crim. App. 2021). According to Morris's testimony, no one was speaking to Appellant when he made the statement. The trial court found Morris to be credible. In sum, Appellant fails to establish that the admission of the statement he volunteered during the booking process violated his *Miranda* rights. We overrule point of error three.

In his fourth point of error, Appellant claims the trial court erred by denying his motion to suppress several statements he made in Officer Enfinger's presence when they arrived at the detention center for booking. In Appellant's view, "the totality of the circumstances objectively show that Enfinger did question the Appellant after the Appellant ha[d] just been improperly questioned by Detective Duke." To the contrary, Enfinger testified that Appellant's statements were not made in response to questions by Enfinger and that no one was talking to Appellant when he made the statements. The trial court found Enfinger's testimony credible. Further, Appellant does not point to anything in the record in support of his assertion. Appellant's assertion is contrary to Enfinger's

testimony and to the trial court's findings. Appellant fails to show that the statements he volunteered to Enfinger were made within the context of custodial interrogation. *See id.* We overrule point of error four.

## II.    *BATSON* CLAIM

In point of error five, Appellant claims that the trial court erred in failing to grant his *Batson* challenge to the State's striking of Venireperson No. 30. *See Batson v. Kentucky*, 476 U.S. 79 (1986) (forbidding race-based peremptory strikes).

A claim that the State used a peremptory challenge based on race calls for a three-step process. *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008); *see also Compton v. State*, 666 S.W.3d 685, 698 (Tex. Crim. App. 2023). First, the defendant must make a *prima facie* showing that the State exercised a peremptory challenge on the basis of race. Once a *prima facie* case of discrimination is shown, the State must provide race-neutral reasons for its peremptory strikes. Finally, the trial judge must determine whether the prosecutor's stated reasons were the actual reasons or were a pretext for discrimination. *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019). The trial court's determination is based largely on its evaluation of the prosecutor's credibility and demeanor. *Id.* at 302-03. Accordingly, a reviewing court generally gives those findings great deference. *Id.* at 303. A trial judge's ruling on the issue of discriminatory intent must be upheld on appeal unless it was "clearly erroneous." *Id.*

Venireperson No. 30 testified that she had previously worked for her sister's law firm as a legal assistant. She said that her sister had litigated police brutality cases,

including at least one lawsuit against SAPD. In her juror questionnaire, Venireperson No. 30 ranked police officers low on a scale for honesty and integrity, meaning "not very honest." She admitted to sharing multiple videos on social media related to alleged mistreatment or injustices by police officers. She admitted to posting a video that purportedly made fun of police officers by satirizing police officers' orientation training. She admitted to sharing an article advocating "defund the police" and said that she agreed with much of the content. She reaffirmed that she did not believe police officers are very honest, and admitted to having a bias against police officers, although she insisted that these beliefs would not interfere with her ability to follow the law and the court's instructions. She testified that in order for her to make an affirmative finding on the first special issue, the State would have to show that the defendant would commit another murder. Finally, she affirmed to the prosecution that she had stated on her juror questionnaire that she did not believe the death penalty should ever be imposed if there is an alternative option of life without parole, although she agreed that she could follow the law and listen to the evidence.

The State challenged Venireperson No. 30 for cause on three grounds: bias against police officers, inability to follow the law on future dangerousness by requiring another murder, and substantial impairment under the law based on her view that a death sentence should not be imposed when there is an alternative sentencing option of life without parole. The court denied the challenge for cause.

The State subsequently used a peremptory strike against the venireperson, and Appellant made a challenge based on *Batson*, stating for the record that Appellant and Venireperson No. 30 are both "of African American descent." The State responded by proffering as its race-neutral reasons for the strike the same three reasons that it had cited as support for its challenge for cause.[5] Appellant pointed out that the State had not questioned other potential jurors about their social media postings. The State responded that they had examined the social media accounts of all of the prospective jurors, but only Venireperson No. 30 had postings reflecting anti-police sentiment. The trial court overruled Appellant's *Batson* challenge.

On appeal, Appellant argues that the State's explanations for its strike of Venireperson No. 30 were pretexts. Appellant points to the venireperson's testimony that she would not automatically disbelieve a police officer and she would judge an officer based on the officer's testimony, that she would follow the law, and would answer the special issues based on the evidence. While this testimony by Venireperson No. 30 would be relevant to whether or not she was challengeable for cause, it does not render the State's race-neutral explanations suspect. The State's race-neutral explanations "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. The trial court's ruling, upholding the State's peremptory strike, was well within the zone of reasonable disagreement given the venireperson's expressed distrust of police officers,

---

[5] When the State proffers race-neutral reasons for its peremptory strike, it renders step one of the *Batson* analysis moot. *Colone v. State*, 573 S.W.3d 249, 263 (Tex. Crim. App. 2019).

particularly in this case, which was likely to involve multiple police officers testifying for the State. Appellant points to no venirepersons of a different race with similar views who were not struck by the State. The State's explanations for striking Venireperson No. 30 were race-neutral, and Appellant does not persuasively show that the State's explanations were pretextual. The trial court's ruling that the State provided a legitimate reason for its use of a peremptory strike was not clearly erroneous. We overrule point of error five.

## III.    PRESENCE OF ALTERNATE JURORS DURING DELIBERATIONS

In points of error six and seven, Appellant complains about the presence of two alternate jurors in the jury room during deliberations in the guilt phase.

As the jury retired to deliberate on guilt, a bailiff asked the judge what to do about the two alternates. At the judge's direction, the bailiff pulled the alternates into the hallway where the judge could talk to them. The judge told the alternates that they would be allowed back into the jury room but would have to follow a few conditions.[6] After agreeing to the judge's conditions, the alternates returned to the jury room where they remained throughout the deliberations on guilt. All of this was unknown to Appellant until after the verdict at guilt.

After the guilty verdict but before the punishment proceedings began, the trial judge held a hearing on the matter. He recounted for the record what he remembered of his instructions to the alternates:

---

[6] The record is not entirely clear, but it appears that the alternates briefly retired to the jury room with the jurors before being pulled into the hallway to be admonished by the judge.

The first is you're not allowed to communicate in any way with anybody. You're not allowed to sit at the table with the other jurors. You need to sit behind the table to where they cannot see you. Don't communicate with your voice, with any head shakes, any head nods, eye rolls, nothing. You in no way are able to participate in this jury deliberation process.

The judge said that the alternates confirmed that they could follow his instructions.

The judge then called the alternates for questioning. Alternate M. Mejia testified as follows:

> THE COURT: Okay. So before the jury retired to the jury room to begin the deliberations, do you recall me speaking to you?
>
> ALTERNATE JUROR MEJIA: Yes.
>
> THE COURT: Okay. Do you want to tell us exactly what you recall that I told you?
>
> ALTERNATE JUROR MEJIA: You told us not to have an opinion about what was going on, like, what they were deliberating, just to sit back and not say anything.
>
> THE COURT: Okay. And so do you specifically recall me telling you that you're not allowed to sit at the table with the other jurors; in fact, sit behind the table --
>
> ALTERNATE JUROR MEJIA: Yes.
>
> THE COURT: -- to where they can't see you?
>
> ALTERNATE JUROR MEJIA: Yes, and we did. We sat off to the side by the bathroom.
>
> THE COURT: Do you recall me telling you that you are unable to communicate in any way, and that includes verbally, it includes with any facial communications, eye rolls, head shakes, head nods, or anything like that?
>
> ALTERNATE JUROR MEJIA: Yes.

THE COURT: Did you abide by those instructions?

ALTERNATE JUROR MEJIA: Yes, I did.

THE COURT: Did you in any way participate in the deliberations while they were ongoing at that time?

ALTERNATE JUROR MEJIA: No, sir.

THE COURT: Did you in any way vote as it relates to whether you believed the Defendant was guilty or not guilty?

ALTERNATE JUROR MEJIA: No, sir.

THE COURT: Did you speak in any way to the jurors at all while you were in the jury room and the deliberations were going on?

ALTERNATE JUROR MEJIA: No, sir.

THE COURT: Did you communicate in any way whatsoever with the other jurors while the deliberations were going on?

ALTERNATE JUROR MEJIA: No, sir.

THE COURT: Did you vote on the verdict of guilt at all?

ALTERNATE JUROR MEJIA: No.

THE COURT: Did any of the other jurors communicate with you in any way or ask you any kind of questions during the deliberations?

ALTERNATE JUROR MEJIA: No.

Both parties declined to ask any further questions.

The judge similarly questioned the alternate V. Salazar-McNabb:

THE COURT: So do you recall specifically before the jurors assembled in the jury room to begin the deliberations, I spoke to you and the other alternate juror?

ALTERNATE JUROR SALAZAR-MCNABB: Yes. . . .

THE COURT: All right, ma'am. And so as it relates to that, do you recall what I told you before the jury started to deliberate?

ALTERNATE JUROR SALAZAR-MCNABB: Yes, I do.

THE COURT: Do you want to tell us what I told you?

ALTERNATE JUROR SALAZAR-MCNABB: Yes. You informed me that I was an alternate along with the other alternate and you asked us not to participate in any part of the deliberation, not to give any kind of facial expression or any kind of hint to anybody else in the room. We just sat on the side and, you know, let them do their deliberation.

THE COURT: So is what I told you, then, essentially the same thing? I'm going to tell you what I recall, and you tell me if it's the same thing that you're saying. So did I tell you that you're not allowed to sit at the table with the other 12 jurors?

ALTERNATE JUROR SALAZAR-MCNABB: Yes, that's correct.

THE COURT: Did I tell you that you're only allowed to sit behind them in a way to where they could not see you?

ALTERNATE JUROR SALAZAR-MCNABB: Yes.

THE COURT: And that you're not allowed to communicate in any way, either verbally or in any nonverbal way of communication, like head shakes, head nods, eye rolls, or anything like that?

ALTERNATE JUROR SALAZAR-MCNABB: Yes.

THE COURT: Did you abide by those instructions?

ALTERNATE JUROR SALAZAR-MCNABB: Yes, I did.

THE COURT: Did you in any way participate whatsoever in the deliberations while they were ongoing?

ALTERNATE JUROR SALAZAR-MCNABB: No, I did not.

THE COURT: Did you in any way vote as to any questions that were put to the rest of the jurors?

ALTERNATE JUROR SALAZAR-MCNABB: No, I did not.

THE COURT: Did you speak in any way to the jurors at all while you were in the jury room and while the deliberations were going on?

ALTERNATE JUROR SALAZAR-MCNABB: No, I did not.

THE COURT: Did you in any way vote or give any opinion or communication regarding a verdict of guilty or not guilty?

ALTERNATE JUROR SALAZAR-MCNABB: No, I did not.

THE COURT: Did any of the other jurors communicate with you in any way?

ALTERNATE JUROR SALAZAR-MCNABB: They did ask, you know, what the circumstance was, but we did tell them, you know, we're not supposed to talk to you about anything that's going on. We're not supposed to give any kind of indication.

THE COURT: Okay. And is that -- that was while the deliberations had begun?

ALTERNATE JUROR SALAZAR-MCNABB: Yes. It was a quick question before anything started.

THE COURT: Okay. And so that question was posed to you before the deliberations started?

ALTERNATE JUROR SALAZAR-MCNABB: Yes.

THE COURT: And it was posed to you as in, what's the situation with you?

ALTERNATE JUROR SALAZAR-MCNABB: Exactly.

THE COURT: And then your response is what you already told us?

ALTERNATE JUROR SALAZAR-MCNABB: Yes.

THE COURT: Subsequent to that communication, did any other juror communicate with you in any way?

ALTERNATE JUROR SALAZAR-MCNABB: No.

THE COURT: All right. Does either side - - State, do you have any questions?

MR. MOREY: I don't have any questions, Your Honor.

THE COURT: Defense?

MR. DE LA GARZA: No, Your Honor.

At the request of defense counsel, the judge also called the jury foreman who confirmed what the alternates testified to:

THE COURT: Okay. And so when you went in to begin the deliberations after I gave y'all the instructions yesterday afternoon, do you recall the alternates that went in after y'all?

JURY FOREPERSON SMITH: Yes, sir.

THE COURT: Okay. And so you know specifically who the alternates were?

JURY FOREPERSON SMITH: Yes, sir.

THE COURT: And how is it that you are aware of that?

JURY FOREPERSON SMITH: We were -- the bailiff came in and notified us who the alternates were and pulled them out of the room and then -- yeah.

THE COURT: Okay. And then they entered the room?

JURY FOREPERSON SMITH: And then they came back into the room, yeah, yeah.

THE COURT: So as y'all did your deliberations, where did the alternates sit?

JURY FOREPERSON SMITH: Oh, they were in the back or in the -- so you walk through the door straight. When you turn right, there were two chairs that weren't at the table, and they were on those side two chairs.

THE COURT: Okay. Then so the alternates then were sort of behind the table where the rest of the jurors sat?

JURY FOREPERSON SMITH: Correct, sir.

THE COURT: Did the alternate jurors in any way participate in the deliberations?

JURY FOREPERSON SMITH: No, sir.

THE COURT: Did they in any way participate in the voting?

JURY FOREPERSON SMITH: No, sir.

THE COURT: Did either alternate speak to any members of any of the jury during the deliberations?

JURY FOREPERSON SMITH: No, sir.

THE COURT: Did any alternate communicate in any way, either facial expressions, verbally, nonverbal communications, in any way?

JURY FOREPERSON SMITH: No, sir.

THE COURT: Did either alternate participate in the vote on the verdict?

JURY FOREPERSON SMITH: No, sir.

THE COURT: Did anybody address the alternates?

JURY FOREPERSON SMITH: No, sir.

THE COURT: So there was -- there may have been a question where before deliberations began, once y'all were the room, where somebody asked the alternates, What are y'all doing or what's the situation with y'all, or something to that effect. Do you recall anything like that?

JURY FOREPERSON SMITH: Yeah. When they stepped out of the room, they just said they're not allowed to participate in the vote or any discussion about the verdict.

THE COURT: Okay. And is that, in fact, what they did?

JURY FOREPERSON SMITH: Correct, sir.

Neither party had further questions.

Appellant then moved for a mistrial in part on the grounds that he was entitled to a jury of twelve under the Texas Constitution, he would have requested a special jury instruction to be read to the entire jury under Article 36.15, and the presence of the alternates amounted to outside influence under Article 36.22. *See* TEX. CONST. art. V, § 15; Art. 36.15; Art. 36.22. The trial court denied the mistrial motion.

In point of error six, Appellant claims that the presence of the alternates during deliberations violated Article 36.22 which provides:

> No person shall be permitted to be with the jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court.

Appellant concedes that the presence of alternates in the jury room during deliberations does not violate the Texas Constitution, but he contends that this Court has not settled the issue under Article 36.22. *See Trinidad v. State*, 312 S.W.3d 23, 28 (Tex. Crim. App. 2010) (holding that presence of alternate jurors in jury room during deliberations "does not mean that the jury was 'composed' of more than twelve members for purposes of Article V, Section 13" of Texas Constitution). Appellant also argues that Article 36.22 was violated when the alternates conversed with the jury, pointing to the testimony of

alternate Salazar-McNabb. He contends that harm is presumed given that the alternates conversed with the regular jurors.

An alternate juror is not part of the "regular jury" until a sitting juror becomes disabled or disqualified, and the trial court replaces them with an alternate juror. *Becerra v. State*, 685 S.W.3d 120, 131-32 (Tex. Crim. App. 2024). Thus, the alternate jurors' presence in the jury room violated Article 36.22's prohibition against a "person" being with the jury while it is deliberating. *See id.* at 134-35. However, the brief exchange between the alternates and the jurors did not amount to "convers[ing] with a juror about the case on trial," considering that nothing was communicated relating to issues raised in the trial or evidence presented, and the alternates did not participate in any way in deliberations. *Cf. id*. at 130, 136 (stating that "[p]articipation in deliberations by an alternate juror establishes an outside influence" and holding that participation of alternate juror in deliberations and casting a vote "constituted impermissible conversation with the jurors about the case on trial").

Moreover, to the extent that the alternates' mere presence as non-jury persons or their alleged conversing with the jury was error under Article 36.22, it is subject to a harm analysis for statutory error. *See* TEX. R. APP. P. 44.2(b). While Appellant argues that harm is presumed, that notion was dispelled in *Becerra*, which held that violations of Article 36.22 are subject to a harm analysis for non-constitutional error under Rule of Appellate Procedure 44.2(b). *See Becerra*, 685 S.W.3d at 137-44. Non-constitutional error must be disregarded unless it affected a defendant's substantial rights. TEX. R. APP.

P. 44.2(b). A substantial right is affected if the error had a substantial and injurious effect or influence on the jury's verdict. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). If we have a fair assurance from examining the record as a whole that the error did not influence the jury, or had only a slight effect, we will not reverse the conviction. *Id.*

As set out above, the trial court instructed the alternates to remain seated behind the jury and refrain from communicating in any manner (either verbally or non-verbally) or participating in the deliberations. The alternates both testified that they followed the court's instructions. Alternate juror Salazar-McNabb testified that there was a brief exchange when they returned to the room before deliberations began. She said they told the regular jurors that they (the alternates) had been instructed not to talk to them about anything during deliberations. She said that after this exchange, there was no other communication with any of the jurors. The jury foreman confirmed the same. By all accounts, the alternates did not interact with the jury or participate in deliberations. Although the alternates were erroneously permitted in the jury room during deliberations contrary to Article 36.22, they did not communicate with the jurors about the case or participate to any extent in the deliberations. Accordingly, we have a fair assurance that their presence did not influence the jury. We overrule point of error six.

In point of error seven, Appellant claims that the trial court's failure to instruct the jury in open court regarding how the alternates should participate during deliberations, and its failure to give the parties an opportunity to offer a special instruction, violated

Article 36.15. Article 36.15 provides in part that a defendant may, by a special requested instruction, call the judge's attention to errors or omissions in the jury instructions. Because Appellant objected as soon as he learned of the alternates' presence in the jury room after deliberations, we will apply the "some harm" standard applicable to preserved jury charge error. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) (recognizing that "some harm" means actual not merely theoretical harm). We have already established that the alternates followed the trial judge's instructions to them and that their silent presence during deliberations did not have a substantial and injurious effect on the jury's verdict. We cannot conceive of any further instruction by the trial court that would have resulted in less intrusive conduct by the alternates in the jury room or provided any better understanding by the jury as to the permissible scope of the alternates' presence and participation. In these circumstances, the trial court's failure to give the parties an opportunity to request a special instruction under Article 36.15 about the alternate jurors' presence did not amount to "some harm." We overrule point of error seven.

## IV.   THE 10-12 RULE

In point of error eight, Appellant claims that Article 37.071 unconstitutionally prevents the trial court or counsel from informing jurors that a deadlocked jury will result in a life sentence. He argues that it is arbitrary and capricious to fail to inform jurors that a sentence of life will result unless all twelve answer "no" to special issue number two. We have considered and rejected this argument many times. *See, e.g.*, *Coble v. State*, 330

S.W.3d 253, 297 (Tex. Crim. App. 2010); *Sorto v. State,* 173 S.W.3d 469, 492 (Tex. Crim. App. 2005); *Davis v. State*, 782 S.W.2d 211, 221-22 (Tex. Crim. App. 1989). We overrule point of error eight.

## V.        DEFINITION OF MITIGATING CIRCUMSTANCES

In point of error nine, Appellant argues that the phrases "personal moral culpability of the defendant" and "sufficient mitigating circumstances" are vague and ambiguous and incapable of being defined objectively, thereby giving the jury unfettered discretion in deciding whether or not to assess the death penalty, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He says the Texas statutory scheme is arbitrary and capricious because jurors are left to guess at the meaning of the terms, which permits them to return a death sentence based on anything they want to believe.

We have addressed and rejected similar claims related to the failure to define "personal moral culpability." *See, e.g.*, *Davis v. State*, 313 S.W.3d 317, 354-55 (Tex. Crim. App. 2010) (rejecting claims that trial court erred in failing to define "personal moral culpability" and "moral blameworthiness," among other terms).

As to the phrase "sufficient mitigating circumstances," the statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Art. 37.071 § 2(f)(4). Given, as noted above, that "moral blameworthiness" is not a phrase that requires definition, and that "mitigating evidence" is defined as fully incorporating the notion of moral blameworthiness, there is likewise no

error in failing to define sufficient mitigating circumstances. And this Court has long rejected claims that the mitigation special issue gives the jury open-ended and unfettered discretion. *See, e.g.*, *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009) (rejecting claim that mitigation special issue unconstitutionally permits "the very type of open-ended discretion condemned in *Furman v. Georgia*"); *Woods v. State*, 152 S.W.3d 105, 121 & n.66 (Tex. Crim. App. 2004) (rejecting claim that mitigation special issue impermissibly gives jurors unfettered discretion and permits arbitrary and capricious imposition of death penalty). We overrule point of error nine.

## VI. CONCLUSION

We affirm the trial court's judgment of conviction and sentence of death.

Delivered: October 30, 2025

Publish